| | |
|---|---|
| COBEY LAKEMPER,<br>            Plaintiff,<br><br>        v.<br><br>ERIK A HOOKS, *et al.*,<br>                Defendants. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

NOW COME Defendants Hooks, Ishee, Lassiter, and Owens (hereinafter "Defendants"), by and through Undersigned Counsel, and hereby submits this Memorandum in Support of Defendants' Motion for Summary Judgment. In summary, Plaintiff complains about the mail policy and inmate legal assistance policy, claiming that they violate his First Amendment. However, both policies were implemented for legitimate penological purposes. Furthermore, Plaintiff complains that Defendant Owens retaliated against him for submitting grievances and lawsuits. However, Plaintiff cannot show that Defendant Owens knew about Plaintiff's grievances or lawsuits, evidencing a lack of causal connection. Additionally, Defendant Owens was merely following DAC policy when he denied Plaintiff's Special Draw Request – not retaliating against Plaintiff. Lastly, Defendants are entitled to qualified immunity. For those reasons, Defendants' Motion for Summary Judgment should be granted.

1

# I.   <u>STATEMENT OF CASE</u>

On February 25, 2020, Plaintiff filed his Complaint.  DE-1.  On October 22, 2020, the Court dismissed this action as frivolous under 28 U.S.C. § 1915.  DE-11.  On November 4, 2020, Plaintiff filed a Motion for Reconsideration.  DE-13.  On August 3, 2021, the Court granted Plaintiff's Motion for Reconsideration, and ordered that Plaintiff submit an Amended Complaint within 21 days.  DE-19.

On August 25, 2021, Plaintiff filed an Amended Complaint.  DE-20.  On November 19, 2021, Plaintiff filed a Motion to Amend Complaint.  DE-22.  On February 28, 2022, Plaintiff filed another Motion to Amend Complaint.  DE-23.  On July 18, 2022, the Court filed its frivolity order addressing Plaintiff's Amended Complaint (combining his Amended Complaint with his two Motions to Amend Complaint).  DE-25.  In its frivolity order, the Court dismissed all access to court claims, but allowed the following claims to proceed: (1) constitutionality of DAC policy against inmate legal assistance (all defendants); (2) constitutionality of DAC policy regarding mail (all defendants); and (3) retaliation (Defendant Owens only).  *Id.*

On December 28, 2022, the Court entered a Case Management Order, which was amended multiple times.  DE-41; DE-45; DE-47; DE-52; DE-54; DE-56; DE-59; DE-63.  Discovery was completed on July 14, 2023.  DE-47; DE-49.  On November 20, 2023, Undersigned Counsel filed his Notice of Substitution of Counsel.  DE-57.  This matter is now ripe for summary judgment.

## II.   STATEMENT OF FACTS

**A.   BACKGROUND**

1.   Plaintiff's Background

On or about February 7, 2014, Plaintiff was convicted of two counts of First Degree Murder and sentenced to life imprisonment. *See* Declaration of Counsel as Ex. A (attached to Appendix as **Exhibit 1**). Since his incarceration, Plaintiff has incurred 11 disciplinary convictions, but none for providing legal assistance. *Id.* at Ex. B.

2.   Defendants' Background

Defendant Hooks is now the Deputy Administrator of the Federal Emergency Management Agency ("FEMA"). *See* Declaration of Hooks at ¶ 2 (attached to Appendix as **Exhibit 2**). Prior to accepting his federal role, Defendant Hooks was the Secretary of the North Carolina Department of Public Safety ("NCDPS") from January 2017 to August 1, 2021. *Id.* As Secretary of NCDPS, Defendant Hooks was responsible for overseeing the various agencies within NCDPS, including the SBI, State Highway Patrol, National Guard, and Prisons. *Id.* at ¶ 3. Each of those various agencies had its own hierarchy of staff members that were responsible for the management of their respective agencies. *Id.* As far as Prisons, Defendant Hooks was not responsible for the creation, implementation, or enforcement of the custody policies applicable to Prisons. *Id.* Specifically, he played no role in the creation or enforcement of the policy relating to inmate mail or the policy prohibiting inmate-to-inmate legal assistance. *Id.*

3

Defendant Lassiter was the Director of Prisons from May 1, 2017 until his retirement in late 2019. *See* Declaration of Lassiter at ¶ 2 (attached to Appendix as **Exhibit 3**). As Director of Prisons, part of Defendant Lassiter's job was to approve, implement, and enforce the policies and procedures related to prisons. *Id.* at ¶ 3. Those policies were reviewed yearly. *Id.* Specifically, the policy related to the prohibition against inmate-to-inmate legal assistance was implemented before he became Director of Prisons. *Id.* at ¶ 4. However, given the potential for inmate's abuse of legal assistance from other inmates, Defendant Lassiter thought it was a good policy that did not need to change. *Id.* Defendant Lassiter was not involved in the decision to move to TextBehind for the processing of inmate mail. *Id.* at ¶ 6.

Defendant Ishee is the current Secretary of the North Carolina Department of Adult Correction, and has been in that role since October 2022. *See* Declaration of Ishee at ¶ 2 (attached to Appendix as **Exhibit 4**). Prior thereto, he was the Commissioner of Prisons from July 2019 until October 2022. *Id.* In both roles, he is/was responsible for overseeing the creation and implementation of policies and procedure related to prisons. *Id.* However, he agrees with the policies in place regarding inmate-to-inmate legal assistance and legal mail.

Defendant Owens was the Warden at Pamlico from October 2018 until his retirement on January 1, 2022. *See* Declaration of Owens at ¶ 2 (attached to Appendix as **Exhibit 5**). Defendant Owens was not responsible for the creation of any department-

4

wide policies. *Id.* at ¶ 3. However, he agrees with the policies in place regarding inmate-to-inmate legal assistance and inmate mail.

**B. APPLICABLE POLICIES**

1. <u>Mail Policies</u>

Prisons across the country have been experiencing problems with contraband being smuggled into the prison through the mail. Specifically, one of the biggest issues is documents dipped in illicit substances (e.g. synthetic marijuana), which can then be ingested or inhaled to intoxicate inmates. *See* **Exhibit 1** at Ex. C (NJ Spotlight News Article); *see also* **Exhibit 4** at ¶ 5.

> The drug, a synthetic version of the psychoactive ingredient in marijuana known as tetrahydrocannabinol (THC), is getting into prisons by being saturated on paper. Once the drug-soaked paper gets inside the prison, users ignite it — sometimes using batteries or electrical outlets — and then smoke it.

*Id.* The drug-soaked paper is difficult to detect. *Id.* In 2021, to assist in combating the introduction of contraband into North Carolina prisons, NCDAC started using TextBehind, a third-party communications company, to process inmate mail, except legal mail. **Exhibit 4** at ¶ 6.

DAC defines "Legal Mail" as "mail to and from attorneys, paralegals working at the direction of attorneys, state and federal courts, the Attorney General of the United States or the Attorney General of North Carolina, the judiciary, the Industrial Commission, consular officials, or legal aid services." **Exhibit 1** at Ex. D, Section

D.0303(b)(1).  For Legal Mail, the legal professional mails the document to the inmate at the inmate's assigned facility, where it is screened and opened as it always has been, even prior to the utilization of TextBehind.  Specifically, the DAC policy states that "[l]egal mail should be managed according to *existing* DOI policy and procedures."  *Id.* at D.0305(a)(10) (emphasis added).  The current (and previous) Legal Mail policy states that "[l]egal mail from offenders may be inspected by correctional staff for contraband in the presence of the offender prior to being sealed" and that "[l]egal mail addressed to an offender may be opened by correctional staff in the presence of the offender unless waived in writing by the offender, or in the circumstances which may indicate contamination."  *Id.* at D.0305(c)(3)-(4).  Lastly, the policy states that all incoming and outgoing legal mail is recorded. *Id.* at D.0305(f).  Thus, nothing has changed for how legal mail is processed.

For all other mail, the sender mails the correspondence to the inmate using the TextBehind address in Maryland.  *Id.* at D.0305(a)(1).  The letter is then scanned by TextBehind, and the scanned image of the letter is electronically sent to the facility to be electronically screened. *Id.* at D.0305(a)(3)-(5).  Assuming the letter is approved, it would then be printed and given to the inmate.  *Id.* at D.0305(a)(6).  If the letter is disapproved, the inmate has the right to appeal.  *Id.* at D.0305(a)(8).

TextBehind policies differentiate "Privileged Mail" from "Non-Privileged Mail." **Exhibit 1** at Ex. E.  Specifically, the difference is "based on Sender's position.  In other

6

words, a document sent only by a practicing attorney or a public official may be considered privileged. Therefore, any document sent by anyone who is not a practicing attorney or a public official is treated as non-privileged mail." *Id.* TextBehind defines "Non-Privileged Mail" as "Any communication sent by a family member, friend, inmate, organization, or educator *regardless of its content*," and states that these materials are "processed as non-privileged mail." *Id.* (emphasis added). Whereas, "Privileged Mail cannot be accessed, reviewed (screened), or processed by TextBehind. Only the authorized personnel at the controlling correctional institution may access privileged mail sent directly by a practicing attorney or a public official." *Id.*

2.      <u>Legal Assistance Policies</u>

DAC policy states that "Offenders are not permitted to assist each other with litigation or legal matters except for assigned law library clerks. Assigned law library clerks are not trained in the law and only provide assistance to those offenders who are unable to read and/or write. The Department of Adult Correction also provides, through contractual services, licensed attorneys for this purpose." **Exhibit 1** at Ex. F (B.0301(q)). Any person who violates that provision can be charged with a C20 disciplinary infraction. **Exhibit 1** at Ex. G (B.0202(C20)).

3.      <u>Trust Account Policies</u>

DAC policy defines a "Special Draw" as "the process that enables offenders to send money from their trust fund account for purposes as defined and approved by DPS

policy." **Exhibit 1** at Ex. H (Section III(a)). "Offenders may request approval for a special draw from their Trust Fund Account for such purposes as to help support dependents, pay an attorney or other legitimate creditor, procure articles authorized under Department regulations and policies, transfer of funds from one inmate's account to another, and to open a savings account in accordance with Departmental policy." *Id.* (Section IV(a)).

In the "Offender Responsibility" section, it notes that that the Special Draw Request is required to be submitted with "proper documentation" as well as "written justification." *Id.* (Section IV(f)(3)). "Example of acceptable documentation would be a bill, invoice, or statement." *Id.*

## C.     PLAINTIFF'S REQUEST FOR A SPECIAL DRAW

On or about April 15, 2021, Plaintiff submitted a Request for Special Draw to pay $900 to Elite Paralegal Services. **Exhibit 1** at Ex. I (Request for Special Draw Packet). It was ultimately disapproved by Defendant Owens, who was the Warden at Pamlico CI at the time. *Id.* Plaintiff's Request for Special Draw was accompanied by a letter explaining that he wanted to "deposit these funds onto [his] EPS 'account' for me to use in upcoming needs pertaining to my civil cases." *Id.* On April 27, 2021, a letter was sent from the Trust Fund Office to Plaintiff, stating that "Money cannot be sent to open accounts for future use." *Id.*

8

### III.   STANDARD OF REVIEW

Courts should grant summary judgment where "there is no genuine disputed as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Thereafter, the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  *Id.* at 324.  Instead, the nonmoving party must "identify *affirmative evidence* from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive."  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (emphasis added).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Celotex Corp.*, 477 U.S. at 323.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Industr'l Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).  Courts have an affirmative duty to prevent factually unsupported claims from proceeding to trial.  *Dowe v. Total Action*

9

*Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

## IV.     LEGAL ARGUMENT

**A.     DEFENDANTS ARE ENTITLED TO SOVEREIGN IMMUNITY AGAINST ANY CLAIMS FOR MONETARY COMPENSATION FROM DEFENDANTS IN THEIR OFFICIAL CAPACITY**

Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivation of civil liberties." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66 (1989). The Eleventh Amendment "bars such suits unless the State has waived its immunity…or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Id.*

The Eleventh Amendment is also applicable to state officers sued in their official capacity. *See Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459 (1945). "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71. "State officials acting in their official capacity are therefore not 'persons' for the purposes of § 1983, and are not proper defendants to a § 1983 lawsuit." *Diggs v. Balogun*, 2017 WL 4921690 at *4 (D. Md. Oct. 31, 2017) (citing *Will*, 491 U.S. at 71).

In this case, Plaintiff's Complaint alleges claims against Defendants Ishee and Owens in both their individual capacity and official capacity. DE-20 at 3-4. As discussed above, Plaintiff cannot legally allege claims against Defendants in their official capacity

10

because Defendants are not "persons," but instead, an extension of the State of North Carolina, who has not waived immunity. Therefore, Defendants are entitled to summary judgment for all official capacity claims seeking monetary compensation.

**B.      PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES REGARDING HIS CLAIM FOR INMATE LEGAL ASSISTANCE**

The PLRA bars civil actions by inmates until "such administrative remedies as are available are exhausted."  42 U.S.C. 1997e(a).  The "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The Fourth Circuit has recognized that NCDPS has established a three-step procedure which governs inmate grievances.  *Moore v. Bennette*, 517 F.3d 717, 721 (4th Cir. 2008); *see also* **Exhibit 1** at Ex. J ("ARP").

1.      <u>Plaintiff Was Aware of the Exhaustion Requirement.</u>

The NCDPS ARP is part of inmate orientation and is explained orally to each inmate.  *Id.* at Ex. J (G.0302(a)(1)).  Furthermore, Plaintiff submitted a grievance regarding his frivolity-dismissed claim for access to courts in relation to DAC's lack of law libraries, but he failed to include anything in the grievance about DAC's prohibition against inmate-to-inmate legal assistance.   Thus, Plaintiff was aware of the exhaustion requirement.

2.      <u>Plaintiff Did Not Exhaust His Administrative Remedies Regarding DAC's Prohibition Against Inmate-to-Inmate Legal Assistance</u>

From January 1, 2019 (well before his Complaint was filed) through November 8, 2022 (after his initial Complaint and Amended Complaint were filed), Plaintiff exhausted 28 grievances. *See* **Exhibit 1** at Ex. K (IGRB Memo). However, none of those grievances include anything about DAC's prohibition against inmate-to-inmate legal assistance. *Id.* at Ex. L (Grievances). Therefore, the Court should find that Plaintiff failed to exhaust his administrative remedies regarding any claim for DAC's prohibition against inmate-to-inmate legal assistance.

**C.      DEFENDANTS HOOKS SHOULD BE DISMISSED**

1.      <u>Plaintiff Failed to Include Defendant Hooks in the Amended Complaint</u>

Rule 10 requires that the caption of a complaint contain the names of all parties. Fed. R. Civ. P. 10(a). "As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mount Ranier*, 238 F.ed 567, 572 (4th Cir. 2001); *see also Tedder v. Johnson*, 2012 WL 931990 at \*1 n. 1 (D.S.C. Feb. 23, 2012) (dismissed defendants named in original complaint because not named in amended complaint); *Richardson-Bey v. Shelton*, 2023 WL 4316299 at \*4 (M.D.N.C. July 3, 2023) (same); *Mays v. Saad*, 2023 WL 5838694 at \*6-7 (N.D. W.Va. Jan. 13, 2023) (same).

In his Amended Complaint, Plaintiff did not name Defendant Hooks. DE-20. Since Defendant Hooks was not included in the caption of the Amended Complaint, nor listed as a defendant in the Amended Complaint, any claims against him should be

12

dismissed. Even though Defendant Hooks was not named in the Amended Complaint, the Court did not address Defendant Hooks in its frivolity order or dismiss Defendant Hooks. Therefore, out of an abundance of caution, Undersigned Counsel will address the liability of Defendant Hooks.

2. <u>Plaintiff Failed to Allege Sufficient Personal Involvement by Defendant Hooks</u>

"Personal capacity suits impose personal liability on a government official *for actions he takes* under color of state law." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (emphasis added). "Liability will only lie where it is affirmatively shown that the official charged *acted personally* in the deprivation of plaintiffs' rights. The doctrine of *respondeat superior* has no application under this section." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (emphasis added).

In his Amended Complaint, Plaintiff did not list any individual allegations for Defendant Hooks. In fact, Defendant Hooks' name is never mentioned in the body of the Amended Complaint (DE-20) and only mentioned in the caption (because it was the original caption) in the two Motions to Amend (DE-22 and DE-23). In Paragraph 17 of the Amended Complaint, Plaintiff lists Defendants Ishee, Lassiter, and Owens, and explains why he believes each of them is liable. DE-20 at ¶ 17. However, he does not list Defendant Hooks, nor does he explain why he believes Defendant Hooks is liable. Therefore, Defendant Hooks should be dismissed due to Plaintiff's failure to state a valid claim against him – namely Defendant Hooks' lack of personal involvement.

13

**D.    NCDPS/NCDAC POLICIES DID NOT VIOLATE PLAINTIFF'S FIRST AMENDMENT RIGHTS**

"Inmates retain certain First Amendment protections, including limited rights to freedom of speech."  DE-25 (citing *Shaw v. Murphy*, 532 U.S. 223, 228-29 (2001); *Turner v. Safley*, 482 U.S. 78, 89-90 (1987)).  "The Supreme Court, however, has held that inmates do not have heightened First Amendment protections for speech involving legal matters. *Id.* (citing *Shaw*, 532 U.S. at 230).  "*Turner* ultimately requires evaluation of whether the regulation is 'reasonably related to legitimate penological interests.'"  *Id.* (citing *Turner*, 482 U.S. at 89).  Under *Turner*, the court considers the following factors:

> (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interests put forward to justify it," (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there was an "absence of ready alternatives" to the regulation in question.

*Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 356 (4th Cir. 2021) (quoting *Turner*, 482 U.S. at 89-90).  As shown below, neither the policies prohibiting inmates from giving legal assistance nor the policies regarding legal mail violated Plaintiff's First Amendment rights.

    1.    <u>Inmates Providing Legal Assistance</u>

The Supreme Court has long held that prisons may prohibit inmates from giving legal assistance to other inmates if reasonable alternatives are available.  *Johnson v. Avery*, 393 U.S. 483, 490 (1969).  The Supreme Court then "declined to cloak the provision of legal

14

assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech," and instead, required courts to use the *Turner* test to evaluate inmate restrictions on providing other inmates with legal assistance. *Shaw*, 532 U.S. at 231. Since then, other courts have found that restrictions against inmates providing legal assistance to other inmates do not violate the First Amendment. *See, e.g., Eason v. Priest*, 2021 WL 3260088 at \*7 (E.D.N.C. June 25, 2021); *Griffith v. Harkleroad*, 2010 WL 1052283 at \*4 (W.D.N.C. March 19, 2010); *Long v. Harkleroad*, 2006 WL 572690 at \*3 n. 2 (W.D.N.C. March 8, 2006); *Sherratt v. Utah Dept. of Corrs.*, 545 Fed. Appx. 744, 748 (10th Cir. 2013); *Shaw v. Murphy*, No. 6:95-cv-00062, DE-66 (D. Mont. July 23, 2001) (dismissing claims after remand from Supreme Court).

When looking at the *Turner* factors, it is clear why prisons prohibit inmates from providing legal advice to one another. For the first factor (rational connection), the Supreme Court held that "[a]ugmenting First Amendment protection for inmate legal advice would undermine prison officials' ability to address the 'complex and intractable' problems of prison administration." *Shaw*, 532 U.S. at 231. The Court went on to acknowledge that prison law clerks "'are sometimes a menace to prison discipline' and that prisoners have an 'acknowledged propensity…to abuse both the giving and the seeking of [legal] assistance.'" *Id.* The Court also acknowledged that "[p]risoners have used legal correspondence as a means for passing contraband and communicating instructions on how to manufacture drugs or weapons." *Id.* The Fourth Circuit has held

15

that prisons have a legitimate interest in suppressing contraband, limiting gang activity, and maintaining discipline and security. *See, e.g., Hines v. S.C. Dept. of Corrs.*, 148 F.3d 353, 358 (4th Cir. 1998). Therefore, prohibiting inmate-to-inmate legal assistance is rationally related to a legitimate penological interest.

The Supreme Court's observations also show the negative impact allowing inmate-to-inmate legal assistance would have on the prison system. It would make it more difficult to detect and control contraband. It would make it easier for inmates to conspire and plot against prison staff. It would enable extortion and bartering among inmates. All of the above would also further gang activity. For those reasons, the negative impacts far outweigh any inconvenience to the inmates.

The last factor also weighs in Defendants' favor because Plaintiff has access to alternative means of legal assistance. First, Plaintiff has access to NCPLS. Furthermore, DAC provides inmates with access to an electronic tablet, which has Westlaw access. And lastly, as Plaintiff has made the Court aware, he is clearly able to access to legal materials from outside sources. Therefore, the Court should find that DAC's policy against inmate-to-inmate legal assistance does not violate Plaintiff's First Amendment rights.

2. <u>Legal Mail</u>

It is assumed that "prisoners have a generalized First Amendment right to send and receive mail." *Hayes v. Phillips*, 2014 WL 7149725 at *5 (E.D.N.C. Dec. 15, 2014) (citing

16

*Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)). "However, prison officials may adopt regulations that impinge on a prisoner's constitutional rights if those regulations are 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89). "Moreover, in noting the delicate nature of prison management, the Supreme Court has 'afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.'" *Id.* (quoting *Thornburgh*, 490 U.S. at 408). "In order to maintain prison security and to check for contraband, prison officials may, pursuant to a uniform and evenly applied policy, open and examine an inmate's incoming mail." *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 574–77 (1974); *Bell v. Wolfish*, 441 U.S. 520, 555 (1979)).

In this case, Plaintiff's Complaint focuses on non-privileged legal materials from a non-legal source. These types of materials would be processed just as any non-legal mail would be processed – through TextBehind. TextBehind specifically states that it differentiates between "Privileged Mail" (i.e. Legal Mail) and "Non-Privileged Mail" based on the identity of the sender, not the content of the material being sent. Thus, even if a non-attorney (e.g. friend or family) were to send legal materials (e.g. statutes or case law) to an inmate, it would be processed by TextBehind as any other pieces of non-privileged mail, such as letters from family.

Simply put, the policies in place allow for all legitimate, non-contraband mail (legal or not) to be received by inmates – the mail just has to sent it to the appropriate

place.  Legal mail should be sent to the inmate at his respective facility; whereas, all other mail should be sent to the TextBehind facility.  Given that NCDAC implemented these policies to combat contraband, these policies were implemented for a legitimate penological purpose.  Furthermore, since there is a method for inmates to send and receive all types of approved mail, the policies do not violate Plaintiff's First Amendment rights.  Therefore, the Court should find that the *Turner* factors weigh in Defendants' favor in regards to the mail policy.

To the extent that Plaintiff did not receive individual pieces of mail, that would not be the result of the policy itself, but rather the application of the policy by the individual responsible for processing those individual pieces of mail.  These Defendants did not process any individual pieces of mail.  Therefore, even if there were individual pieces of mail that were not processed in accordance with the above policies, Defendants should still be entitled to summary judgment because they had no personal involvement with any alleged violation of Plaintiff's First Amendment rights.

**E.      PLAINTIFF LACKS STANDING FOR HIS POLICY CLAIMS BECAUSE HE WAS NOT INJURED BY DEFENDANTS**

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014).  "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  *Id.* at 157-158 (internal

quotations and citations omitted).  As shown below, this case should be dismissed because Plaintiff cannot show an injury in fact.

For the inmate legal assistance policy, Plaintiff cannot show an injury.  Specifically, he has failed to show that there was a specific inmate who wanted to help Plaintiff, but was unable, or that the type of legal assistance he needed could only be obtained from a specific inmate.  Furthermore, given that he has alternatives for legal assistance, such as PLS, Westlaw, and third-party vendors, Plaintiff has failed to show that he does not have access to legal assistance.  To the contrary, Plaintiff's electronic messages show that he is able to receive legal assistance from a third party vendor.  **Exhibit 1** at Ex. M.  And lastly, Plaintiff was never charged or convicted of a disciplinary infraction for providing legal assistance to other inmates.  **Exhibit 1** at Ex. B (Disciplinary History).  Therefore, the prohibition against inmate-to-inmate legal assistance has not caused an injury to Plaintiff.

For the mail policy, Plaintiff cannot show an injury.  Specifically, as noted above, the policies allow inmates to receive non-privileged legal materials from non-legal individuals through the mail procedures implemented by TextBehind.  Since the policies allow Plaintiff to receive these materials, he cannot show an injury in fact.  Even if Plaintiff can show that he did not receive certain pieces of mail, he cannot attribute it to the policies for which he is challenging.  Therefore, he cannot show a causal connection to these Defendants.

19

**F.    DEFENDANT OWENS DID NOT RETALIATE AGAINST PLAINTIFF**

"[N]ot every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." *Suarez Corp. Indust. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  Inmate claims of retaliation are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).

For an inmate to prove a First Amendment retaliation claim, he must prove "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)) (cleaned up).  As shown below, Plaintiff cannot satisfy the second and third elements.

    1.    <u>Plaintiff Has Failed to Allege a Protected First Amendment Activity</u>
          <u>*Prior To* The Alleged Retaliatory Action</u>

In his Complaint, Plaintiff merely stated that Defendant Owens "summary denial of Plaintiff's essential request to send/mail his own personal funds to EPS was malicious and flagrantly retaliatory."  DE-20 at 9.  Plaintiff never identified any specific protected activity that preempted the alleged retaliatory act.  Without the initial protected activity, Plaintiff cannot prove a retaliation claim.

20

2.      <u>Defendants' Actions Did Not Affect Plaintiff's First Amendment Activity</u>

For the second element, the Fourth Circuit requires that "the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected [act]." *Suarez Corp. Indust.*, 202 F.3d at 686; *see also ACLU of Md.*, 999 F.2d 780 at 785. This means that there must be "sufficient facts to warrant concern that the alleged retaliation might have a chilling effect on the exercise of the right to access the courts and show that he suffered more than de minimis inconvenience." *McFadden v. Lewis*, 517 Fed. Appx. 149 (4th Cir. 2013) (citing *ACLU of Md.*, 999 F.2d at 785-86 n. 6). Thus, in addition to considering whether protected speech was actually curtailed, courts are "required to also evaluate whether [the defendant's] actions 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights.' This objective inquiry examines the specific facts of each case, taking into the account the actors involved and their relationship." *Booker v. S.C. Dept. of Corrections*, 583 Fed. Appx. 43, 44 (4th Cir. 2014) (quoting *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006)).

Generally, it is undisputed that Plaintiff continued to file grievances and lawsuits after Defendant Owens' actions. Specifically, even after his Special Draw Request[1] was denied in April 2021, Plaintiff submitted and fully exhausted at least 10 grievances. *See* **Exhibit 1** at Ex. L (Grievances). The subject of those grievances ranged from things as

---

[1] It should also be noted that Plaintiff does not have a constitutional right to send money from his inmate trust account. *See, e.g., Bijeol v. Benson*, 404 F. Supp. 595, 599 (S.D. Ind. 1975) (held "federal prisoner has no constitutional right to send money through the mail.")

minor as being denied a pen-pal service, to censorship of text messages, to confiscation of personal property. *Id.* Furthermore, even after his Special Draw Request was denied in April 2021, Plaintiff filed at least two federal lawsuits. *See LaKemper v. Owens, et al.*, No. 5:21-ct-03293-M, DE-1 (E.D.N.C. Sept. 22, 2021); *LaKemper v. Honeycutt, et al.*, No. 5:22-cv-00189-MR, DE-1 (W.D.N.C. Dec. 15, 2022). Simply put, Defendant Owens' actions did not affect Plaintiff's ability to exercise his First Amendment rights, and would not have affected that of a person of ordinary firmness.

Lastly, Plaintiff cannot show that Defendant Owens' action adversely affected his ability to communicate with EPS because Plaintiff continued to communicate with EPS and utilize their services, even *after* the Special Draw Request was denied. For example, on April 18, 2023, Plaintiff sent a message to EPS asking for them to conduct a PACER search and the results to be texted to him. **Exhibit 1** at Ex. M (Text Messages). Robert Branam, with EPS, responded the next day with the requested information. *Id.* Plaintiff then replied the following day "Bob, Thank a lot, man. Take care. Cobey." *Id.* Therefore, the Court should find that Plaintiff has failed to show that Defendant Owens' actions adversely affected him.

    3.    <u>There is No Causal Connection Between Any Protected Activity and Defendants' Actions</u>

For the third element, to show a causal connection, an inmate must prove:

[A]t the very least, that the defendant was aware of her engaging in protected activity. Knowledge alone, however, does not establish a causal connection between the protected activity and the adverse action. There

22

must also be some degree of temporal proximity to suggest a causal connection. A lengthy time lapse between the public official's becoming aware of the protected activity and the alleged adverse action…negates any inference that a causal connection exists between the two.

*Constantine*, 411 F.3d at 501 (internal citations and quotations omitted). "Temporal proximity" between the inmate's protected activity and the allegedly retaliatory action "is simply too slender a reed on which to rest" the causation element of a retaliation claim. *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993).

Defendant Owens' actions were not related to any alleged protective activity by Plaintiff. First, Plaintiff has no evidence that Defendant Barney knew of any lawsuits or grievances filed before the denial of Plaintiff's Special Draw Request. Specifically, none of Plaintiff's prior lawsuits were against Defendant Barney, and Plaintiff had only filed two grievances[2] at Pamlico CI prior to the denial of his Special Draw Request – neither of which involved Defendant Owens (either as a witness or a participant). Therefore, Plaintiff cannot show that Defendant Owens was aware of that Plaintiff engaged in any alleged protective activity.

Furthermore, even if Plaintiff was engaged in protected activity by filing grievances, none of them were against Defendant Barney. Thus, Defendant Barney had no reason to retaliate against Plaintiff.

---

[2] The 4850 number at the beginning of the Grievance Number signifies Pamlico CI; the 4885 number signifies Tabor CI.

23

Furthermore, the two grievances that Plaintiff filed at Pamlico CI were submitted at least two months before the denial of his Special Draw Request, destroying the temporal connection between any prior grievance and the denial of his Special Draw Request.

Most importantly, there was a legitimate reason to deny Plaintiff's Special Draw Request – it did not comply with DAC policy. *See* **Exhibit 1** at Ex. L (Grievance No. 4850-2021-GPD-2-00319); *see also* **Exhibit 1** at Ex. I (Plaintiff's Special Draw Request Packet). It should be noted that Elite Paralegal Services is far more than a "legal" office because they provide far broader services, including pen-pal services, celebrity photos, and flowers delivery to inmates' loved ones. *Id.* Plaintiff's Special Draw Request did not comply with DAC policy for two reasons: (1) it was not for an approved purpose; and (2) it failed to attached acceptable documentation. Plaintiff's Special Draw Request failed to attach a bill, invoice, statement, or order form. Instead, he was merely attempting to send money to a service provider for future services, not to pay a creditor or procure anything specific. Since Defendant Owens was complying with the DAC policies, he was not retaliating against Plaintiff. Therefore, the Court should dismiss Plaintiff's retaliation claim.

**G. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

The doctrine of qualified immunity protects government officials from actions for civil damages as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

24

*Fitzgerald*, 457 U.S. 800, 818 (1982). "[I]t is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526. "The test for qualified immunity is a two-pronged inquiry. The court must determine, in no particular order, (1) whether a constitutional right has been violated on the facts alleged and (2) whether the right was clearly established at the time so that it would be clear to an objectively reasonable officer that his conduct violated that right." *Adams v. Parsons*, 2011 WL 1464856 at *4 (S.D. W.Va. April 15, 2011) (citing *Saucier v. Katz*, 533 U.S. 194, 200–02 (2001)). Qualified immunity's fundamental purpose is intended to give "government officials breathing room to make reasonable but mistaken judgments" and protect "all but the plainly incompetent or those who knowingly violate the law" from the costs of suit. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

For an alleged constitutional right to be "clearly established", "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, (1987). This determination is to be assessed as of "the time an action [or inaction] occurred." *Harlow*, 457 U.S. at 818. According to the Fourth Circuit, the question is "whether pre-existing law makes apparent the unlawfulness of the officer's conduct." *Sims v. Labowitz*, 885 F.3d 254, 263 (4th Cir. 2018). Thus, even if a plaintiff demonstrates a constitutional violation, an official is nonetheless entitled to qualified immunity if a reasonable person in the

official's position "could have failed to appreciate that his conduct would violate those rights." *Meyers v. Baltimore County*, 713 F.3d 723, 731 (4th Cir. 2013).

In this case, as shown above, none of Plaintiff's constitutional rights were violated. However, even if his constitutional rights were violated (which they were not), such constitutional rights were not clearly established at the time. Specifically, it was not clearly established that prohibiting inmate-to-inmate legal assistance violated Plaintiff's First Amendment rights. To the contrary, the existing jurisprudence all show that Plaintiff has no such First Amendment right. Furthermore, it was not clearly established that DAC's mail policy violated Plaintiff's First Amendment rights. And lastly, it was not clearly established that DAC could not limit the use of Plaintiff's trust fund monies. Therefore, Defendants should be entitled to qualified immunity.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted this the 21st day of February, 2024.

JOSHUA H. STEIN
Attorney General

/s/ Alex R. Williams
Alex R. Williams (N.C.S.B. No. 41679)
Special Deputy Attorney General
N.C. Department of Justice
Public Safety Section
P.O. Box 629
Raleigh, North Carolina 27699-9001
Telephone: 919-716-6528
Facsimile: 919-716-6761
awilliams@ncdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, and that I will cause the foregoing document to be served on all non-CM/ECF participant(s) by depositing a copy in the U.S. Mail, postage prepaid, addressed as follows:

> Cobey LaKemper
> OPUS No. 0767480
> Alexander Correctional Institution
> 633 Old Landfill Rd.
> Taylorsville, NC 28681
> *Pro Se Plaintiff*

This the 21st day of February, 2024.

/s/ Alex R. Williams
Alex R. Williams
Special Deputy Attorney General