IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

FILED

APR 0 5 2024

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

| | |
|---|---|
| COBEY LAKEMPER, | ) |
| Plaintiff, | ) |
| v. | ) |
| ERIK A. HOOKS, et al., | ) |
| Defendants | ) |

Civil Action No.: **5:20-CT-3083-FL**

## MEMORANDUM OF LAW IN OPPOSITION TO SUMMARY JUDGMENT

COMES NOW, Plaintiff, pro se, and in opposition to summary judgment hereby submits this memorandum of law in support thereof. Plaintiff now states:

## STATEMENT OF THE CASE

On 25 February 2020, Plaintiff ("Plaintiff") commenced this action asserting claims for violations of his civil rights pursuant to 42 U.S.C. Section 1983, naming as Defendants Erik A. Hooks, Todd E. Ishee, Kenneth E. Lassiter, and Brad Perritt ("Defendants"), at all relevant times [D.E. 1].

Following initial dismissal [D.E. 11] then a successful effort by Plaintiff to alter or amend judgment [D.E. 13] and an amended complaint [D.E. 20] followed by supplemental pleadings [D.E. 22, 23], on 18 July 2022, the Court issued its order allowing to proceed three claims: Plaintiff's First Amendment claim challenging the NCDAC policy prohibiting prisoners' assisting one another with "litigation or legal matters"; Plaintiff's First Amendment claim challenging the NCDAC policy effectively prohibiting the receipt of non-privileged legal material via "Personal Mail"; and Plaintiff's First Amendment

retaliation claim against Defendant Barney Owens [D.E. 25], added as a party by Plaintiff's Complaint, as amended. Pursuant to the order the operative pleadings are D.E. 20, 22, 23. Plaintiff's denial of access to the court claim was dismissed, as was any claims against Defendant Perritt.

On 21 February 2024, Defendants filed their summary judgment motion [D.E. 71].

Plaintiff hereby responds in opposition, respectfully informing the Court why summary judgment is not appropriate and Defendants' motion should be denied, in full.

## SUMMARY AND NATURE OF THE CASE

Plaintiff filed this case challenging the blanket-ban on law libraries at all state prison facilities. Before the Court presently are three (3) issues: (1) Defendants policy-based prohibition on legally-oriented speech among prisoners. This claim does not include seeking the right to be a "jailhouse lawyer" or illegally practicing law, but rather discussing legal matters and sharing legal information; (2) Defendants effective policy-prohibition on receiving non-privileged legal material via incoming personal mail. The mail processing provider and NCDAC Policy expressly prohibit "legal mail" from being processed, which in practice has encompassed anything legal in nature; and (3) Retaliatory action taken against Plaintiff when attempting to have personal funds sent to a prisoner-vendor providing legal research and copies, which due to policy-prohibitions was Plaintiff's only remaining source for photocopying legal exhibits and service copies, and research legal matters.

Defendants memorandum attempts to mislead the Court by manipulating the facts and realities of the numerous legal-related prohibitions, and their actual intents and purposes. Plaintiff will demonstrate a prison system deploying policies and prohibitions as instruments intended to suppress prisoners' rights to speech and receive needed legal material and meaningfully access the courts, while invariably employing overused but hard-challenged terms such as "contraband" and "security," resulting in the most-restrictive legal-related policies in the nation. As exhibited hereunder, indigent

pro se state prisoners are now prevented from obtaining legal information and material other than by way of irregular and impermissible methods.

## STATEMENT OF THE FACTS

### A.) Assist Another Person With Litigation Or Legal Matters / Free Speech Claim

#### Grievance Exhaustion

Plaintiff submitted a grievance addressing the prohibition on prisoners discussing legal matters while at Pasquotank Correctional Institution (Plaintiff Declaration ¶ 2). According to surviving notes the grievance was dated 3 October 2015 and assigned Grievance No: 3740-01-15-0211. The grievance was summarily rejected by Unit Manager Hurdle based on "Code G" for allegedly containing "More than one incident," although Plaintiff's included reference to not having law library access was meant to illustrate the legal-discussion need (Plaintiff Declaration ¶ 2). Hurdle neglected to "complete" the "Reason Justification" space required per the form's instructions. A copy of the grievance was not produced by Defendants because NCPLS failed to request grievances regarding this claim when conducting discovery on Plaintiff's "behalf" (Exhibit A). Plaintiff communicated by mail with NCPLS following their initial discovery requests concerning the need for more which eventually resulted in a reply (Exhibit B), although NCPLS neglected to serve any additional and Plaintiff cannot recall whether he even recognized the grievance omission among many others.

Unfortunately, Plaintiff cannot recall what happened to Plaintiff's rejected 2015 grievance, whether lost by prison staff during many searches or voluntarily discarded, although its significance was not apparent when this case was filed in February 2020 since Plaintiff's "Assist/Speech" claim was intended as an "in addition to", in totality, supporting-componet meant to illustrate the absence

of a "reasonable alternative" to the blanket-ban on law libraries, Plaintiff's primarily-intended "Right to Redress" claim and therefore the imperfect "in addition to" language within the Amended Complaint [¶ 8, D.E. 20]. However, the Court's <u>18 July 2022</u> order [D.E. 25] dismissed Plaintiff's redress claim but advanced the supporting componet: the instant "Assist/Speech" claim.

NCDAC Policy, <u>Chapter G, Section .0307</u> ("Time Limits") does not include any language establishing a policy-imposed statute of limitations rendering a filed grievance effectively-unexhausted due to expired time-frame violations (Exhibit C, pp. 4 6).

While a grievance Plaintiff filed in <u>2019</u> concerning the blanket-ban on law libraries did reference parenthetically the absence of a "reasonable substitute" (i.e the ability to discuss legal matters and share needed information with fellow prisoners, e.g.), it did not specifically cite "speech" (Exhibit D) as did Plaintiff's more specific <u>2015</u> grievance, which did <u>not</u> contain more than one incident as alleged (Plaintiff Declaration ¶ 2).


<u>Policy-Prohibition On State Prisoners Discussing "Legal Matters"</u>


Defendants maintain a policy-based prohibition on prisoners assisting one another with "litigation or legal matters" (RFPD 0009). In effect, the prohibition includes any and all speech legal in nature (Plaintiff Declaration ¶ 3; Sauls Declaration ¶ 2; Thompson Declaration ¶ 1; Edwards Declaration; Wall Affidavit ¶ 1; Wong Affidavit ¶ 2; Richardson Affidavit ¶ 1), which is routinely enforced with consequences for those in violation (Amended Complaint, D.E. 20, ¶ 13 (b)(c)).

Defendants' state that the valid penological interest in prohibiting prisoners from providing assistance with "litigation or legal matters" is because it is "unlawful for any person other than an active member of a state Bar to practice law" (Ishee Interrogatory No. 12, p. 8); to "deter legal activity" and to "ensure the safety and security of facility staff and offenders" (Ishee Interrogatory No. 15, p. 9), and to "stop inmates from owing each other which can lead to fights and assaults, it is considered bartering and trading" (Owens

Interrogatory No. 15, p.10).

Defendants' discovery responses and memorandum of law with exhibits do not identify specific references to incidents or evidence of prisoners illegally practicing law or engaging in illegal activity or risks to safety and security of facility staff and offenders, or inmates owing each other or fighting as a result of legal-related speech or bartering and trading, and do not identify how the reasons cited are relevant to prisoners discussing legal matters (Ishee + Owens Interrogatories No.'s 12-16; Defendants' Memorandum, D.E. 72).

On 1 May 2017, Defendant Lassiter was promoted to NCDAC Director of Prisons after serving in other prison capacities for thirty (30) years (Lassiter Interrogatory No. 2, p.4). Shortly thereafter, Defendant Lassiter amended 'Offender Disciplinary Policy', establishing changes which naturally superseded previously-existing policy. Its "Issue Date" was 17 July 2017 (RFPD 0006).

Per Defendant Lassiter's changes the former "D16" disciplinary infraction–"Assist Another Person With Litigation Or Legal Matters"–was amended and increased in severity to a "C20" (RFPD 0009). According to NCDAC 'Offender Disciplinary Policy', a "C" infraction is more harshly-punishable than a "D" (RFPD 0028, section .0202). While Defendant Lassiter's amended disciplinary procedures discontinued all "D" infractions as they formerly-existed, not all former "D" infractions were amended to a "C" infraction and four (4) of the seventeen (17) former "D" infractions were not increased to a "C" and were discontinued altogether (RFPD 0010, .0202(d)).

As such, Defendant Lassiter elected to maintain the "Assist" infraction as a punishable offense while amending Policy, and opted to increase severity and punishment. Designated punishment imposed include: Custody demotion; loss of sentence credits; 30 hours extra duty; loss of privileges; and limited trust fund withdrawals (RFPD.0011).

On 17 July 2017, Defendant Lassiter endorsed by signature his amended 'Offender Disciplinary Policy' (RFPD 0027).

Although having served in numerous capacities within NCDAC and at least five (5) different prison facilities, beginning his career as a regular correctional officer in 1989 (Lassiter Interrogatory No. 2, p.4),

Defendant Lassiter has no personal "knowledge" of Defendants' policy-justification for the prohibition on prisoners assisting one another with litigation or legal matters (Lassiter Interrogatory No. 12, p. 8) or Defendants' policy-justification for prisoners being subject to disciplinary infractions for assisting one another with litigation or legal matters (Lassiter Interrogatory No. 13, p. 9) or how NC prisoners are supposed to obtain legal assistance in light of pertinent NCDAC policy-prohibitions on matters legal in nature (Lassiter Interrogatory No. 14, p. 9) or what "negative effects" Defendants' ban on prisoners assisting one another is intended to deter (Lassiter Interrogatory No. 15, p. 9). Furthermore, Defendant Lassiter has no knowledge of the policy-justification he relied upon for upgrading in severity the disciplinary infraction issuable to prisoners assisting one another (Lassiter Interrogatory No. 16, p. 10).

On 1 July 2019, Defendant Ishee succeeded Defendant Lassiter as the new Commissioner of Prisons (Ishee Interrogatory No. 2, p. 3). Defendant Ishee maintained the existence of the "C20" disciplinary infraction, its enforcement, and punishing consequences during his tenure as Commissioner until October 2022, and currently as Secretary of Corrections.


a.) Absence Of Permissible Alternatives To Prisoners Discussing "Legal Matters" And Sharing Information


Prison law libraries within North Carolina facilities closed in 1989 (Exhibit E). Since then, indigent pro se state prisoners are directed by Defendants' to contact NCPLS concerning any and all legal matters (Exhibit F), and identified by NCDAC Policy (.0204) as being the "primary and preferred method of inmate access to the courts" (Exhibit F, p. 2); thereby being indigent, pro se prisoners' exclusive source for legal "assistance."

However, due to numerous reasons identified by NCPLS' own legal staff (Sookram Declaration), NCPLS is with very few exceptions expressly unable or unwilling to provide needed assistance due to inadequate funding (Plaintiff Declaration ¶ 4), conceding that NC prisoners "should still have law libraries" (Exhibit G). NCPLS does not "make copies, perform legal research...provide clerical

or litigation support services" for pro se prisoners (Exhibit E, Amended Complaint, ¶7, p.7 D.E. 20); does not "evaluate individual inmates' claims relating to their conditions of confinement, including medical issues, uses of force, inmate violence, religious concerns, and any other issue that relates to an inmate's prison life" (Exhibit H), nor provides "copies of case law or copies of statutes, answer hypothetical questions", or answer questions relating to "wills, estates, child custody, divorce", inter alia (Exhibit I); nor does NCPLS provide general support such as friend of the court briefs (Exhibit J), assist in receiving better access to educational or vocational programs (Exhibit K), or provide routine discovery-assistance in civil cases having passed initial review[1] (Exhibit L).

Despite the limited nature of NCPLS' assistance, NCDAC Policy (.0209) advises that the existence of NCPLS "negates the need for one inmate to provide legal assistance to another inmate (Exhibit F, p.3)

## GTL Tablet Law Library App

In late-October 2021, Plaintiff received general access to a GTL tablet featuring an electronic law library app[2] (Plaintiff Declaration ¶5). Due to having been incarcerated without pause since 2005 and not exposed to modern technology while confined, Plaintiff has been regularly unable to navigate the app. NCDAC staff do not provide instruction to prisoners requiring assistance, nor permit more-capable prisoners to provide tutorials to less-able prisoners (Plaintiff Declaration ¶5; Rivers Declaration ¶3; Ingle Declaration ¶1; Arnold Declaration ¶2), enforcing the no-assistance rule by prohibiting prisoners from taking tablets to the dayroom. As such, Plaintiff is generally unsuccessful conducting research and required to impermissibly pay more-knowledgable prisoners to research matters on

---

[1] LaKemper v. Owens, et al, Case No. 5:21-ct-03293-M, passed initial review on 26 October 2022.

[2] Thomson Reuters WESTLAW Correctional

Plaintiff's behalf. The app subscription is very basic and disallows access to many internal features which if activated would aid technology-illiterate prisoners to better access the app (Plaintiff Declaration ¶ 5).

While the app does include a "print" feature, which if enabled would allow prisoners to print paper-copies of the information viewed digitally, it is fully disabled and NCDAC staff consistently advise that prisoners are prohibited "by policy" from printing any material into paper-form (Plaintiff Declaration ¶ 6). The GTL system apparently contains continuous glitches obstructing usability, complained about by both staff and prisoners, with WI-FI frequently unoperational. Tablets often "break" internally, and when needing repair or replacement prisoners often wait many weeks without tablet or law library access (Plaintiff Declaration ¶ 7). NCDAC staff allow tablets charged only once per 24 hour period, further limiting app accessibility.

Defendants' do not provide access to physical "law libraries or legal texts" (Exhibit F, p. 2) as a substitute when the law library app is unavailable.

"Offender Law Clerk"

On or around 11 August 2023, NCDAC created the position of "Offender Law Clerk" as a prisoner-occupation.[3] According to policy, "Each facility will have an offender assigned as a Law Library Clerk who will be assigned to assist other offenders with legal materials as needed" (i.e. writing paper, carbon paper, writing utinsels). The position exists "on paper" but is not presently operational and provides no policy-approved legal services (Plaintiff Declaration ¶ 8; Willis Affidavit; Rivers Declaration ¶ 2). The three assigned law clerks since the inception of the position were in practice and training exclusively regular library clerks with no knowledge of law and not assigned to provide assistance of a legal nature, nor have been directed by staff to provide assistance to other prisoners, legal or otherwise.

[3] NCDAC Policy, Chapter G, Section .0203(j)

b.) <u>Plaintiff And Other Prisoners Required To Violate NCDAC Policy Seeking/Providing Evidentiary Support</u>

Plaintiff was required to violate the "C20" disciplinary infraction on numerous occasions when communicating clandestinely with other prisoners seeking assistance with "legal matters" in the form of affidavits and declarations (Plaintiff Declaration ¶ 9) and, in effect, asked other prisoners to violate NCDAC Policy because the evidentiary support assisted Plaintiff with "litigation or legal matters" (RFPD 0009).

c.) <u>Plaintiff Indigent</u>

Plaintiff is indigent and cannot afford to pay for the services of an attorney to assist with litigation or legal matters (Exhibit M, D.E. 7). With the exception of <u>late-2020</u> and <u>2021</u>, Plaintiff has been indigent while confined in NCDAC since June 2011. Plaintiff has sought the assistance of NCPLS on thirteen (13) occasions during that period, and the only time assistance was provided was discovery appointment in this case (Plaintiff Declaration ¶ 10; D.E. 32).

d.) <u>Injury</u>

Plaintiff has been required to exist within the confines of the "D16/C20" NCDAC Policy since <u>June 2011</u>. On four (4) occasions between <u>Jan 2019 - Jan 2022</u>, as an option to receiving a "C20" disciplinary infraction and pursuant to the maintenance thereof, Plaintiff was compelled by NCDAC staff to relinquish possession of personal legal material and research aides <u>and</u> perform approximately ninety hours (90) of "extra duty" after being discovered discussing legal matters with and receiving needed legal assistance from other prisoners (Amended Complaint ¶ 13(b)(c), p 12, D.E. 20). The punishments transpired on <u>13 January 2020</u>, <u>8 February 2020</u>, <u>10 December 2020</u>, and <u>5 June 2021</u> by NCDAC officials Ward, Roberts, Perry, and Burns, respectively (Plaintiff Declaration ¶ 11), acting pursuant to the section of NCDAC Policy amended and maintained by Defendant's Lassiter and Ishee.

B.) De Facto Prohibition On Receiving Non-Privileged Legal Material Via Personal Mail

Beginning on 13 October 2021,[4] NCDAC prisoners longstanding, designated method for receiving incoming non-privileged mail "Personal Mail" (i.e. letters, cards, photos, drawings, legal copies and other non-privileged legal-related material, e.g.) was rendered obsolete, and since then prisoners are prohibited from receiving non-privileged mail via any medium other than through TextBehind, a for-profit mail-processing business in Maryland where, since 18 October 2021 prisoner-mail must be sent from family, friends, vendors, and any source not identifiable as "Legal" (Exhibit N, Second Supplemental ¶ 4, p.2, D.E. 23)

Upon receipt of acceptable material, TextBehind staff scan the incoming mail items, and when functioning as advertised the scanned-images are then digitally-forwarded to the respective facility of the intended recipient-prisoner for printing and distribution by correctional staff.[5] After the mail item is scanned the original is later destroyed ("securely shredded"). Any "Personal Mail" sent directly to a prisoner's facility is summarily returned or destroyed without notice or appeal rights (Second Supplemental ¶ 4, p.2, D.E. 23; Defendants' Memorandum Exhibit D (.0305(a)), pp. 18-19, D.E. 74-1).

Per the expressed policy of TextBehind and NCDAC 'Mail Policy' (.0305(a)(9)), legal mail is prohibited (Ishee Admission No. 28, p. 21; Exhibit N). In practice, TextBehinds' definition of legal mail has included any material legal in nature (Plaintiff Declaration ¶ 12; Thompson Declaration; Sauls Declaration ¶ 1; Lucas Affidavit; Marty Thompson Declaration ¶ 2; Wall Affidavit ¶ 2; Wong Affidavit ¶ 1; Richardson Affidavit ¶ 2), such

[4] NCPLS also failed to request 2021-issued 'Mail Policy' (D, .0300) when conducting discovery. As such, Plaintiff's source is the dorm bulletin-board displaying the applicable 2021 version (See Plaintiff's Declaration ¶ 1). Defendants' Memorandum Exhibit D has a 2023 issue date, which with notable exceptions is generally accurate.

[5] The paper method has since been eliminated, as well, and as of 20 October 2023 all non-privileged mail is received digitally on the tablets.

as personal legal papers, case transcripts, court opinions, case-supporting affidavits from free-citizens wishing to provide them, needed legal copies, e.g. (Second Supplemental ¶5, p.3, D.E. 23). Upon receiving material considered "legal", TextBehind summarily returns the mail item to the sender without providing notice or appeal rights to the intended prisoner-recipient or sending party (Exhibit N).

Due to the longstanding NCDAC policy-prohibition on prisoners obtaining "photocopy" access internally (Exhibit F, p.2, .0203(h)), prior to 18 October 2021 pro se prisoners requiring legal copies (i.e. service copies, case exhibits, e.g.) were required and at liberty to mail the original material to family, friends, vendors, or law students to be copied, which subsequently were mailed back to the prisoner directly via "Personal Mail", which was not policy-prohibited and the only available method to indigent pro se prisoners (See aforecited collective-Declarations and Affidavits; Second Supplemental ¶7, pp. 3-4, D.E. 23).

However, due to the provisions of the arrangement established with TextBehind by Defendant Ishee and Ishee's superseding creation and enforcement of NCDAC Policy on 13 October 2021 (Ishee Admission No. 27, p. 21), pro se prisoners unable to afford the services of an attorney are thereafter policy-prohibited from employing the former methods and cost-free sources due to the de facto prohibition (Plaintiff Declaration ¶13; Collective Declarations and Affidavits).

Simultaneous to the inception of TextBehind, on 13 October 2021 Defendant Ishee also amended the operative definition of privileged "Legal Mail" sources. Formerly, NCDAC Policy defined "Legal Mail" as: "Mail to and from attorneys, state and federal courts, the Attorney General of the United States... or of North Carolina, the judiciary, the Industrial Commission, consular officials, or legal aid services or a paralegal" (.0308(b)(1)) (Exhibit O, p.2).

As of 13 October 2021, Defendant Ishee's amended definition reads: "Mail to and from attorneys, paralegals working at the direction of attorneys... or legal aid services" (.0303(b)(1)) (Defendants' Memorandum of Law, B.1, p.5, D.E. 72) (emphasis added). Consequently, pro se prisoners are prohibited from employing the more-affordable services of an independent paralegal (for research, copies, e.g.) and

must thereafter and henceforth employ an attorney in order to access and communicate with a paralegal and for incoming legal material sent to the facility to be recognized as privileged and "Legal Mail" by definition, which is as of 13 October 2021 the only mail prisoners are permitted to receive direct (Defendants' Memorandum Exhibit D (.0305(a)(1)), p.18, D.E. 74-1; Second Supplemental ¶ 6, p.3 (citing former "legal source" definition).

a.) Evolution Of TextBehind Function

Sometime in 2022, a prisoner-rumor circulated internally that parties were experiencing slight success, albeit inconsistent, receiving legal material via TextBehind, provided the free-citizen sender mixed-in material not legal in nature among the coveted legal as, in effect, camouflage (Plaintiff Declaration ¶ 14). Subsequently, Plaintiff experienced some success, although senders continued having problems sending non-privileged material into 2023 and had to alter documents by employing "white-out" and other methods to eliminate the appearance of legal (Exhibit P). Successful receipt was further dependent, in part, on family, friends, vendors, or any source willing to employ measures that lawfully-conscientious citizens perceive as suspect, and achieved by sending-parties writing "Not Legal" on the envelope enclosing the material (Exhibit Q, R).

However, prisoners remained without pause precluded from receiving certain types of non-privileged legal material required to litigate legal matters, such as original case exhibits needing to remain original[6] and not tainted by the printed markings applied during TextBehinds' scanning process in the bottom and right-side margin (Plaintiff's Declaration ¶ 14).

On 20 October 2023, Defendant Ishee amended 'Mail Policy' again, establishing that thereafter and henceforth all incoming non-privileged mail is received electronically on the GTL tablets[7] (Plaintiff's

_____

[6] Per NCDAC Policy, Chapter D, Section.0305(a)(3)(C), original mail is "shredded" following receipt and scanning.

[7] Exhibited online at https://www.dac.nc.gov/divisions-and-sections/prisons/offender-mail

Case 5:20-ct-03083-FL    Document 78    Filed 04/05/24    Page 12 of 33

Declaration ¶15; Arnold Declaration ¶1; Rivers Declaration ¶1; Ingle Declaration ¶2), prohibiting incoming paper mail and all permissible methods by which prisoners may receive non-privileged legal material via 'Personal Mail.'

b.) <u>Absence of Alternatives</u>

While there are other state prison systems in the country also limiting prisoners' receipt of personal mail to digital, alternative methods are available whereby law students and legal clinics and independent paralegals and combinations thereof are policy-permitted to send legal material direct to pro se, indigent prisoners, or prisoners are allowed to print legal material researched on physical-law library computers or print-enabled tablets and purchase legal copies by way of per-page commissary order (Plaintiff Declaration ¶16; Wilson Declaration). Defendant Ishee's policies and amendments omit and prohibit alternative, permissible methods.

c.) <u>Contraband Primarily Introduced By Corrupt Prison Staff, Not Mail</u>

Prior to the advent of TextBehind and scanned mail, contraband such as phones, tobacco, liquor, marijuana, watches, pornography, phone chargers, fast food, e.g.—items much too large to conceal in a letter—were present within every NCDAC facility Plaintiff has been assigned (Plaintiff Declaration ¶17). Following the inception of TextBehind and elimination of directly-sent mail, contraband is not noticeably-less present within the NCDAC prison community.

On 31 May 2017, prior to the inception of TextBehind in NCDAC, the Associated Press (AP) published a story titled "<u>Observer Investigation Shows Abuse, Corruption In NC Prisons</u>." The story did not identify concerns about K2 or other contraband being introduced via prisoner mail or any medium other than corrupt staff activity. <u>Exhibited at:</u>

https://apnews.com/article/586e19e4b1z64a2590eb88d70b12ee1f

In 2018, former Chief Deputy Secretary for NCDAC, David Guice, consented to interview by the Charlotte Observer, which extends twelve (12) minutes and is featured on YouTube, with the concluding four (4) minutes dedicated primarily to the introduction of contraband into North Carolina facilities via corrupt prison personnel. The former Chief Deputy Secretary states:

"Naturally at our close custody facilities most of the contraband comes in from corrupt staff. There's no question about that."

The story is titled "How NC Prison Officers Fuel Corruption And Abuse", and did not identify concerns by the former Chief Deputy Secretary about "K2" or other contraband being introduced via prisoner mail or any medium other than corrupt staff activity. Exhibited at: www.YouTube.com/watch?v=3816PaZ5Kj4

On 3 April 2018, Prison Legal News (PLN) featured a story titled "Corruption Among Prison Guards In NC Spurred By Low Pay", referencing therein Defendant Hooks' efforts to combat the introduction of contraband via corrupt prison personnel, including by searching staff prior to entering the facility. Defendant Hooks did not identify concerns about "K2" or other contraband being intro—duced via prisoner mail or any medium other than corrupt staff activity.[8] Exhibited at: https://www.prisonlegalnews.org/news/2018/apr/2/corruption-among-prison-guards-north—carolina-spurred-low-pay/

On or about 16 January 2024, Plaintiff filed in the instant case 'Notice Of Criminal Deprivation Of Rights Under Color Of Law By Alexander Prison Staff', and in ¶ 9, p. 5 states:

---

[8] Due to Defendant Ishee's policy-based prohibitions and absence of alternatives, Plaintiff is prevented from attaching documentary exhibits of the referenced news articles.

"In reality, the large majority of contraband present within all North Carolina prisons... is almost without exception introduced via corrupt staff... Furthermore, within the previous two (2) month period alone two (2) officers were walked out and terminated for introducing drugs into the facility. Alexander administrative personnel deviously employ camouflaging-techniques in a manipulative effort to shift blame from dirty prison staff to continuously-blamed prisoners." [D.E. 64]

Following the inception of TextBehind and simultaneous prohibitions, it has become customary for NCDAC prisoners to obtain needed legal services and receive legal copies in impermissible and irregular ways, such as bribing other prisoners whose jobs place them in proximity to staff—only copy machines, and bribing NCDAC staff (Plaintiff Declaration ¶ 18).

d.) Defendant Ishee's Policies Motivate Department-Wide Deprivations

Defendant Ishee, as Commissioner of Prisons from 1 July 2019 to October 2022 (Ishee Interrogatory No. 2, p.3; Ishee Admission No. 27) is responsible for amending 'Mail Policy' to include the establishment of TextBehind and its de facto prohibition of non-privileged legal material via incoming 'Personal Mail', and the simultaneous alteration of the definition of privileged 'Legal Mail' to be more restrictive and prohibit independent paralegals. As Secretary of Corrections from October 2022 to Present, Defendant Ishee is also responsible for the prohibition of paper mail and thereby digital-exclusive receipt of non-privileg—ed legal material, without available alternatives and in absence of valid or compelling penological justification. "In both roles, Defendant Ishee is/was responsible for overseeing the creation and implem—entation of policies and procedure related to prisons" (Defendants Statement Of Material Facts Not In Dispute ¶ 15, p.3, D.E. 73).

e.) Injury

Plaintiff has been required to exist within the restrictions of both TextBehind and NCDAC mail related policies and prohibitions since October 2021. Additionally, on five (5) occasions between January 2022 — January 2024, non-privileged legal material mailed to Plaintiff from three (3) non-privileged sources[9] was summarily rejected and returned to the senders by TextBehind due to being legal in nature. The returns transpired in January 2022 (x2), June 2022, February 2023, and July 2023 (Plaintiff's Declaration ¶ 19; Second Supplemental ¶ ¶ 10, pp. 4-5, D.E. 23) pursuant to TextBehinds' custom of returning non-privileged legal material[10] but due to Defendant Ishee's establishment of TextBehind, cognizant and in spite of its policies, as NCDAC prisoners' exclusive source for non-privileged mail. Furthermore, the first January 2022-return caused Plaintiff to suffer a Twenty Two dollar (22.00) injury due to lost service fees and postage costs.

C.) Special Draw Denial/Retaliation

On 18 December 2020, Plaintiff was transferred to Pamlico Correctional Institution ("Pamlico") per the terms of a Settlement Agreement in a 2017 lawsuit in which NCDAC staff violated Plaintiff's right to send/receive mail and be free of retaliation for filing grievances (Exhibit S, 1.c, pp. 2-3).
Shortly thereafter, on 30 December 2020 and 8 January 2021, Defendant Owens disapproved each and every Christmas greeting card mailed to Plaintiff from family (Exhibit T, U, V, W),

[9] Due to Defendant Ishee's policy-based prohibitions and absence of alternatives, Plaintiff is prevented from receiving affidavits from the senders to attach as documentary exhibits.

[10] When Plaintiff's family emailed TextBehind on 9 February and 10 February 2022 concerning returned non-privileged legal material, TextBehind staff replied, "We do not accept legal mail."

although the cards were all commercially-produced and not different from the cards received by other prisoners."[11]

On 14 February 2021, Plaintiff filed a grievance regarding the disapproved cards[12] and Pamlico staff acting "outside the boundaries of Policy" (Exhibit X). At the time Plaintiff was not aware that it was Defendant Owens and not "mailroom" staff who disapproved Plaintiff's Christmas cards (Plaintiff's Declaration ¶ 20). Meanwhile, after Plaintiff sent correspondence to Defendant Owens concerning the disapprovals, Defendant Owens replied contending that they were legitimate (Exhibit Y).

On 15 April 2021, Plaintiff submitted a 'Request For Special Draw' form (PCI 1.10-1) to his unit manager, Earnest Riggs, seeking approval to have funds deducted from Plaintiff's account and sent to Elite Paralegal Services ("EPS"), a prisoner-vendor of good standing providing legal and other services since 2009 where Plaintiff has maintained an account since 2017 or thereabouts (Plaintiff's Declaration ¶ 21). Within the space provided on the form for "Purpose", Plaintiff wrote:

> "Perform legal research and provide legal material and copies. I have three (3) pending civil lawsuits against NC DOC and need the services of EPS in order to litigate, particularly since NCPLS does not provide assistance" (Exhibit Z).[13]

Attached to Plaintiff's 'Special Draw' was a cover letter to EPS, as per routine, providing basic instructions (Exhibit AA) and an addressed stamped envelope.

---

[11] Although Exhibits U, V, W show disapproval dates of 8 December 2021, they were served on 8 January 2021, as indicated by the signature-dates below, and not processed until after the holidays.

[12] Defendant Owens' disapproval-reasons were not included among the articulated reasons authorized by Policy, nor was the "Section" relied on for all four (4) disapprovals applicable to the cards.

[13] The civil actions were LaKemper v. NCDPS, I.C. TA-29116, a negligence claim concerning the 2020 one-month suspension of "Sick Call" at Tabor, resulting in a ruptured eardrum; LaKemper v. NCDPS, I.C. TA-27971, a negligence claim concerning lost property; and the instant lawsuit [D.E. 20, p.17].

Later the same day, Mr. Riggs summoned Plaintiff to his office asking whether Plaintiff had an order form for legal services, bill, or any information about EPS' services. Plaintiff replied that a "bill" implies debt and debt is prohibited by policy, but Plaintiff did have a current 2021 brochure (Exhibit BB) which Plaintiff retrieved then provided to Mr. Riggs to keep (Plaintiff's Declaration ¶ 22). Riggs reviewed the brochure, then conducted a quick review of EPS' website and ratings. Satisfied, Mr. Riggs approved the request then noted "It's a business" in the margin (Exhibit Z).

After realizing that Plaintiff's 'Special Draw' had not been executed and due to a time-sensitive legal need, on 28 April 2021 Plaintiff engaged Mr. Riggs inquiring of its status (Amended Complaint, ¶ 10, p.10). Riggs placed a call then advised that Defendant Owens denied Plaintiff's request because funds could not be sent for "future use". Riggs informed Plaintiff that on no previous occasion, to his knowledge, had Defendant Owens disapproved a Special Draw request (Plaintiff Declaration ¶ 23). Later at mail call, Plaintiff received correspondence from Defendant Owens' designee, "T. Freeman, Trust Fund Office", advising that funds "cannot be sent to open accounts for future use" (Exhibit CC).

Meanwhile, Plaintiff sent correspondence directly to Defendant Owens concerning the retaliatory nature of the denial, and submitted a formal grievance (RFPD 0133). On 4 May 2021, the "Step One" Response to Plaintiff's grievance was issued by Defendant Owens' designee (RFPD 0134) containing general criteria to satisfy Special Draw requests. The Response indicates that an "inquiry was conducted," and includes no reference to the earlier "future use" prohibition. The same day, Defendant Owens' administrative assistant, Sherri Valerio, advised that Plaintiff must be "stupid to think" that the Pamlico Trust Fund Office would release Plaintiff's funds for use in a "lawsuit against DOC" (Plaintiff Declaration ¶ 24; Amended Complaint ¶ 10(c), p.10, D.E. 20), adding that Plaintiff would have been smarter to lie on the form.

On 7 May 2021, Defendant Owens responded to Plaintiff's earlier correspondence (Exhibit DD)[14] providing primarily two (2) highlighted-reasons justifying his denial of Plaintiff's Special Draw:

---

[14] One of many pertinent documentary exhibits Defendants' withheld during discovery (See Exhibit A, No.15).

"Your request was denied based on the following:

— Policy prohibits an offender from incurring debt;" and

— EPS does not qualify as a "local financial institution."

Later, on 21 May 2021, Defendant Owens' designee issued a "Step Two" Response to Plaintiff's grievance (RFPD 0135) which held, in part:

"Your special draw was denied due to you trying to send money to Elite Paralegal Services... Upon research of Elite Paralegal Services, it was discovered that they are not a legal office, but an establishment that provides services. Offenders are only authorized to send money to licensed attorneys/legal agents."

However, Defendant Owens' designee indicated in the "Step One" Response that prisoners can send money to order a "magazine, book, etc" (RFPD 0134), and the same "Step Two" Response indicates that money can be sent to "procure articles" authorized by policy (RFPD 0135). On 27 May 2021, the "Step Three" Response to Plaintiff's grievance [15] (Exhibit EE) further indicates that prisoners can send money for "school clothes, Christmas, etc," and provides another reason for Defendant Owens' denial of Plaintiff's request to send personal funds to pay for legal research and copy needs: NCDAC facilities having "had a significant influx of intoxicants flowing into the facility and illegal strong-arming activities."

According to NCDAC Pamlico 'Standard Operating Procedures', Section 1.10, p.1, [16] art supplies and wallets are items authorized for purchase (RFPD 0001), as are "books, magazines, newspapers, or photographs" (RFPD 0002). Nearly an entire page of policy is devoted to purchases of Art Supplies (RFPD 0004) and another to Wallets (RFPD 0004-0005). Pamlico SOP does not specifically reference sending money to pay for general legal-related services, nor is it prohibited (RFPD 0001-0005).

---

[15] Another documentary exhibit Defendants' withheld during discovery.

[16] Defendants' produced the amended version issued on 30 June 2021, subsequent to what applied in April 2021. Plaintiff recalls the previous version being even more liberal and indulgent.

Pamlico is a medium-custody facility, and as such Defendant Owens routinely approved 'Special Draw' requests for a wide variety of vendor purchases, including: Photos of partially-nude women (or men); Dungeons + Dragons paraphernalia; swimsuit calendars; sports almanacs, e.g. (Plaintiff's Declaration ¶ 25).

To illustrate the absence of 'Special Draw' denials at Pamlico, on 18 May 2021 during the grievance process Defendant Owens' designee sent an email to the Trust Fund Office asking, "Could you please submit a statement why the offender was denied his money order?", designated "High" importance (RFPD 0139). Followed on 20 May 2021 with, "I'm still trying to understand why it was denied" (RFPD 0138).

Plaintiff never at any time referred to EPS as an attorney or "legal office" (Plaintiff's Declaration ¶ 26), although Pamlico administrative and mailroom staff designated EPS a "Legal" source and logged all mail sent to Plaintiff from EPS in the legal mail log prior to Defendant Owens' denial of Plaintiff's 'Special Draw'. See receipts logged on 22 February 2021 (RFPD 0165); 3 March 2021 (RFPD 0166); 21 March 2021 (RFPD 0170); and 13 April 2021 (RFPD 0171).

Then again shortly after Plaintiff's 'Special Draw' was denied, when EPS sent slips advising that Plaintiff's order could not be filled until payment was received and returning uncopied documentary material Plaintiff sent to be copied: 3 May 2021 (RFPD 0173); and 17 May 2021 (RFPD 0174).[17]

NCDAC "Pamlico Mailroom Operations" policy,[18] issued on 17 January 2019 then signed and endorsed by Defendant Owens on 29 January 2019, defines the purpose of the log referenced in the above "RFPD" citations 0165-0174: "Mail Record Book: The DC-218 form log book obtained from the DPS Central Warehouse, to be used for the purpose of documenting incoming and outgoing special correspondence or packages. (Examples include legal mail, packages, negotiable instruments, and unauthorized funds received in the mail.)"

Still requiring legal copies for an Industrial Commission case, on 29 April 2021 Plaintiff forwarded

---

[17] Plaintiff mailed the time-sensitive material to EPS certain that the 'Special Draw' would be approved.

[18] NCPLS also neglected to request this policy. However, Plaintiff copies verbatim from the Policy received via pro se discovery responses obtained in LaKemper v. Owens, et al. (See Plaintiff's Declaration ¶ 1)

correspondence to Defendant Owens seeking assistance obtaining legal copies, informing Defendant Owens that Plaintiff would be happy to pay a "per-page fee" according to his cost-designation (Plaintiff's Declaration ¶27). On 24 May 2021, Defendant Owens responded denying Plaintiff's request (Exhibit FF); later indicating that prisoners needing copies of documentary material are "given carbon paper to write on to get copies" (Owens Admission No.1, pp. 13-14).

According to Defendant Owens, the policies and procedures NCDAC staff are "required to follow" when prisoners request to send money via 'Special Draw' first include directing prisoners to "complete the special draw form to the unit manager for verification" (Owens Interrogatory No.7, p.6), who then forwards the verified form to Defendant Owens "if correct." However, Defendant Owens later advises that the verificat-ion componet of the two-step process "would have not been the job of the unit manager" (Owens Admission No.5, p.15).

Defendant Owens indicates that he denied Plaintiff's 'Special Draw' due to Plaintiff "not giving all information" (Owens Interrogatory No.17, p.10), a task previously assigned by Defendant Owens to belong to the first step of the process: "complete the special draw form to the unit manager for verification," who "if correct" then forwards to Defendant Owens (Owens Interrogatory No.7, p.6). Again in Interrogatory No.18, p.10, Def-endant Owens states that Plaintiff "did not complete the paper work correctly." However, Plaintiff completed every available space on the form (Exhibit Z), which Unit Manager Riggs verified then approved.

As Warden of Pamlico from 2018-2022 (Owens Interrogatory No.2, pp.3-4), Defendant Owens was a high-ranking agent of NCDAC who denied Plaintiff's request to send personal funds to a legal services vendor in an effort to sustain pending civil litigation against NCDAC (Owens Admission No.12, p.17) desp-ite NCDAC Policy, Chapter G, "Access to Courts" (.0202) providing that prisoners will not be "penalized" for allegations against the Department or its employees (Exhibit F, p.1).

a.) Injury

More than eight (8) months after Defendant Owens denied Plaintiff's 'Special Draw' request, and subsequent to the inception of the restrictive TextBehind, on 30 December 2021 Plaintiff was still trying without success to obtain copies of documentary material needed to sustain litigation against NCDAC (Exhibit GG); and still a year and a half later, on 24 October 2022, Plaintiff continued trying unsuccessfully to obtain legal copies (Exhibit HH). Due to Defendant Owens' denial Plaintiff has been prevented from and has not on any occasion thereafter been able to receive via incoming mail needed legal copies, civil litigation research results,[19] or general legal aid material (Plaintiff's Declaration ¶ 28), and has been left with no other alternatives other than to resort to impermissible methods to obtain service copies and satisfy research needs in this case.

As a direct result of Plaintiff having been denied the ability to access EPS' legal research services, Plaintiff's meritorious Industrial Commission claim[20] was dismissed without prejudice for reasons avoidable had Plaintiff been permitted to delegate research matters to EPS (First Supplemental ¶ 2, p.2). Once the State appellate process concluded in September 2023 one (1) month remained prior to statute of limitation expiration, effectively preventing Plaintiff from obtaining forms and timely filing a Section 1983.

Furthermore, Plaintiff suffered the effects of retaliation, per se, by a prison official in response to accessing the court in lawsuits against NCDAC (Amended Complaint ¶ 13(a), p.12).

## ARGUMENT AND AUTHORITIES

### Summary Judgment Standard

---

[19] EPS' owner and operator, Robert Branum, was at all times relevant, upon information and belief, a licensed paralegal with research training and experience, of which Plaintiff has none.

[20] NC Court of Appeals opinion, COA23-87, stemming from I.C. TA-29116, whereby Plaintiff indisputably suffered a ruptured eardrum due to one (1) month suspension of "Sick Call" procedures in 2020.

"Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56 (a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Jones v. Solomon, 90 F. 4th 198 (4th Cir. 2024).

## A.) Assist Another Person With Litigation Or Legal Matters / Free Speech Claim

"Summary judgment should be denied unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." OOIDA Risk Retention Group, Inc. v. Charity Contract Hauling, LLC, 666 F. Supp. 3d 500 (M.D.N.C., March 30, 2023).

## Grievance Exhaustion

Plaintiff is aware of NCDAC 'Administrative Remedy Procedures' and has employed it often in a particularly oppressive prison system. Defendants' identify in their Memorandum (p.12) that from 1 January 2019 through 8 November 2022 Plaintiff filed 28 grievances [D.E. 72]. This case was filed in February 2020 [D.E. 1]. Defendants' referred back only thirteen (13) months prior to Plaintiff's original complaint was filed, thereby omitting Plaintiff's 2015-filed grievance.

This matter can be resolved by Defendants' production of the grievance, which in turn would also resolve the second componet currently outstanding: Plaintiff complying with the specific language of grievance rules, to wit: "More than one incident." Plaintiff has at times not articulated well, but did not include more than one (1) "incident" in his grievance and as such it should not have been rejected. Plaintiff cannot control what injustices hostile prison staff employ in their efforts to discourage redress." To satisfy

the Prison Litigation Reform Act's (PLRA) exhaustion requirement, grievances generally need only be sufficient to alert the prison to the nature of the wrong for which redress is sought." <u>Wilcox v. Brown</u>, 877 F.3d 161 (4th Cir. 2017). "An administrative remedy is not considered to have been available... if a prisoner, through no fault of his own, was prevented from availing himself of it." <u>Patel v. Moron</u>, 897 F. Supp. 2d 389 (E.D.N.C., Sept. 25, 2012) (quoting <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008), or when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." <u>Ross v. Blake</u>, 578 U.S. 632 (2016).

## Content-Based Speech Prohibition

"(C20) Assist Another Person With Litigation Or Legal Matters"

"<u>Assist:</u>" to give support or aid

"<u>Matters:</u>" a subject under consideration; a subject of disagreement or litigation; the events or circumstances of a particular situation; the subject or substance of a discourse or writing...

—2024 Merriam Webster, Inc.

The First Amendment of the Constitution "protects the right to receive information and ideas' from a willing speaker." <u>Stephens v. Cnty. of Albemarle, VA</u>, 524 F.3d 485, 491 (4th Cir 2008) (quoting <u>Stanley v. Georgia</u>, 394 U.S. 557, 564 (1969).) Even in a nonpublic forum, "government officials cannot 'suppress expression merely because they oppose the speaker's view," <u>Tobey v. Jones</u>, 706 F.3d 379 (4th Cir 2013) (quoting <u>United States v. Kokinda</u>, 497 U.S. 720, 721, 110 S.Ct. 3115, 111 L.Ed 2d 571 (1990)). One primary purpose of the First Amendment was to protect the free discussion of governmental affairs, a principle which transcends forums. Id. When evaluating whether a regulation violates the First Amendment, "the most exacting scrutiny" is applied to "regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." <u>Turner Broad. Sys., Inc., v. F.C.C.</u>, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed 2d 497 (1994)(emphasis

added). "Laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." Id. at 643, 114 S.Ct. 2445 (emphasis added) "A prison regulation restricting an inmate's First Amendment rights must operate without regard to the content of the expression, as would support validity of the regulation." Minton v. Childers, 113 F. Supp. 3d 796 (D. Md., July 13, 2015). "Only a compelling state interest centering around prison security, or a clear and present danger of a breach of prison discipline or some substantial interference with orderly institutional administration can justify curtailment of prisoners' right to receive information and ideas." Burke v. Levi, 391 F. Supp. 186 (E.D.Va, Richmond Division, March 14, 1975). "Any regulation of prisoners' speech must not be any more encompassing than necessary to further penological interests involved." Ballance v. Virginia, 130 F. Supp. 2d 754 (W.D.Va., Roanoke Division, Sept. 27, 2000). Although courts afford deference to the judgments of prison administrators, the deference is not limitless. Greenhill v. Clarke, 944 F. 3d 243, 253 (4th Cir. 2019).

To evaluate the constitutionality of a prison policy that impacts the First Amendment rights of prisoners, the court must look to the following factors established in Turner v. Safley, 482 U.S. 78 (1987):

(1) Whether a "valid, rational connection" exists between the regulation and the legitimate interest that would be advanced by its enactment. Response: On its face a fact finder may be impelled to consider the policy legitimate if for no other reason than the existence of a slightly similar, albeit less broad or speech-restrictive, policy in other states and courts rarely intervene. However, upon information and belief there exists no other prison system within the country maintaining as many simultaneously-suppressive regulations as Defendants, who have not presented a single justifying incident as evidence in defense of their incredible, hyper-restrictive prohibitions. Although other prison systems typically prohibit prisoners litigating for other prisoners, they do not prohibit legal speech, and almost without exception they are provided physical law library access, or Inmate Counsel Substitute programs, or sufficiently funded legal aid services, or combinations thereof, and are able to receive legal material via mail.

As written and considering the in-totality restrictions of Defendants' collective policies, there

exists _not_ a "valid, rational connection." See <u>Wall v. Wade</u>, 741 F.3d 429, 499 502 (4th Cir. 2014) (First Amendment violated where prison required inmates to provide physical indicia of Islamic faith because policy not reasonably related to legitimate penological interest.)

(2) Whether alternative means of exercising the asserted right would remain available. _Response:_ No. Defendants' do not provide an alternative means of exercising Plaintiff's asserted right to discuss legal matters. Legal speech is prohibited as an extension of the "C20" disciplinary infraction under any and all circumstances as a blanket-ban. See <u>Vester v. Rogers</u>, 795 F.2d 1179 (4th Cir. 1986).

(3) Whether accomidation of the asserted right would adversely affect guards, other inmates, or the allocation of prison resources. _Response:_ No. Prison staff are sufficiently-trained and keen to identify and easily distinguish when prisoners are harmlessly exchanging non-disruptive legal speech versus illegally practicing law; similar to how they distinguish when prisoners consensually exchange magazines, which is policy-permissible,[21] versus violating policy by bartering for the same magazine (RFPD 0009, "C09") or strong-arming for the magazine (RFPD 0007, "A21"). Furthermore, accomodation would have a positive effect generally, for if prisoners were free to exchange legal information ~~they would~~ thereby be better educated and less likely to file as many baseless, absurd lawsuits, as are common in North Carolina. Many of the frivolous actions would be headed off by more reasonable prisoners, less ignorant or mentally ill. See <u>Haze v. Harrison</u>, 961 F.3d 654 (4th Cir. 2020) ("When neither common sense nor evidence demonstrates a reasonable causal nexus" between a prison administrator's ends and chosen means, "summary judgment... is inappropriate.")

(4) Whether an obvious, less burdensome alternative to the regulation exists. _Response:_ Yes. The "C20" should be amended to something less broad and all-encompassing so that illegally practicing law remains prohibited and speech alone is excluded, such as: "Litigate for another person, or solicit or exact payment, for any matter legal in nature." The existence of an alternative regulation better suited to accomodate a

---

[21] NCDAC Policy, <u>Chapter D, Section .0101(d)</u>, "Inmates may exchange newspapers, magazines... and vendor catalogs. Any attempt to use this means to exchange contraband or to use publications as an item of barter" is prohibited.

prisoner's rights may be evidence that the regulation is an unreasonable, "exaggerated response" to penal concerns. Turner, 482 U.S. at 90-91 (noting that under "least restrictive alternative" test, prison required to "set up and then shoot down every conceivable alternative method of accomodating" the asserted rights).

In 2001, the Supreme Court decided that a "prison inmate did not possess a First Amendment right to provide legal assistance to fellow inmates beyond protections normally accorded prisoners' speech." Shaw v. Murphy, 532 U.S. 223 (2001)(emphasis added). It is well-established, as a general rule, the government "may not suppress lawful speech as the means to suppress lawful speech." Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002)(emphasis added)

## B.) De Facto Prohibition On Receiving Non-Privileged Legal Material Via Personal Mail

"Summary judgment is appropriate when the evidence is so one-sided that one party must prevail as a matter of law." Tekman v. Reliance Standard Life Insurance Company, 55 F. 4th 951 (4th Cir. 2022).

"As a general rule, prisoners have a constitutionally-protected interest in their incoming and outgoing mail correspondence, and persons outside of prison also have an interest in corresponding with prisoners." Moorehead v. Keller, 845 F. Supp. 2d 689 (W.D.NC, Asheville Division, Feb. 29, 2012); Thornburgh v. Abbott, 490 U.S. 401, 408 (1989). "As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty, but the law and the Constitution demand recognition of certain other rights." Scott v. Clarke, 61 F.Supp. 3d 569 (W.D.Va, Charlottesville Division, Nov. 20, 2014). "Prisoner's right of free speech, especially as it relates to the right to communicate by mail, and his right to worship can only be restricted to the extent that such restraint is necessary to protect a legitimate governmental interest." Sweet v. South Carolina Dept. of Corrections, 529 F. 2d 854 (4th Cir. 1975). In Turner v. Safely, the Supreme Court held that, to violate the First Amendment, a prison policy or regulation must (1) "impinge [ ] on inmates' constitutional rights" and (2) lack a reasonable relation to "legitimate penological interests"; 428 U.S. 78, 89 (1987)

To evaluate the constitutionality of Defendants' policies restricting Plaintiff's right to receive non-privileged

legal material via incoming mail, and in paper form, the court must again look to Turner:

(1) Whether a "valid, rational connection" exists between the regulation and the legitimate interest that would be advanced by its enactment. Response: Combatting contraband is always of neciosity, but as presented by Defendant Hooks' own published concerns and more damnably the statements of the former Chief Deputy Secretary, NCDAC staff are the primary vectors for drugs and phones and other contraband, and Defendants' were effectively-precluded from including a NC-specific news article because those in NC exclusively cite corrupt staff as the contraband-introducers and not prisoner mail. In any case, legitimate concerns do not create a pass for Defendants' to establish a de facto blanket-ban by deploying a multitude of prohibitive-policies, and manipulatively using "security" as a pretext to censor. Furthermore, Defendants remain incriminatingly-silent about any alleged relationship between contraband and their policies impacting prisoners' receipt of non-privileged legal material, such as if the true goal is solely to combat contraband and not obstruct legal efforts then why not simply enable the "Print" feature on both the digital "Mail" app and "Law Library" app to thereby allow translation into paper form?, or why Defendants' shifted to digital-only mail in October 2023 when "Personal Mail" had been TextBehind-scanned since 2021 and unquestionably free of contraband?, or why altering the definition of "Legal Mail" was necessary when paralegals have not been accused of wrongdoing? Defendants' policies do not bear a rational connection to legitimate objectives, such that any relationship between the two is "so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. 89-90.

(2) Whether alternative means of exercising the asserted right would remain available. Response: No. The result of Defendants' prohibitions is an effective blanket-ban. Only non-indigent prisoners able to employ an attorney are able to receive needed legal material via mail, thereby restricting pro se court access. "If penal regulation either intrudes upon First Amendment rights of nonprisoners or constitutes total denial of prisoner's right to free speech, including any alternative means of exercising that right, then state must satisfy Procunier strict-scrutiny requirement, burden of demonstrating both substantial state interest and absence of less restrictive alternative rests upon proponent of rule." Vester v. Rogers, 795 F. 2d

1179 (4th Cir. 1986) (emphasis added)

(3) Whether accomodation of the asserted right would adversely affect guards, other inmates, or the allocation of prison resources. Response: Not in any negative way. All mechanisms are currently present to facilitate prisoner's receipt of non-privileged legal material via mail (or other reasonable alternative) and only need to be enabled by Defendant Ishee. Moreover, other state systems generate significant revenue through commissary-sold legal-related items serving as an alternative to mail-received material, such as copies. Furthermore, Defendants' policies have had the unintended effect of easier acclimating NCDAC to corruption via non-illegal acts such as providing legal-related services. Corrupt prison staff should not benefit financially or sexually from administratively-imposed prisoner-deprivations and well-meaning staff should not be exposed to or burdened by needless corruption produced by hyper-restrictive policies implemented under the cloak of "security", the existence of which is counterproductive to the good health of the prison community.

(4) Whether an obvious, less burdensome alternative to the regulation exists. Response: There are many: Enable "Print" function on both the "Mail" and "Law Library" apps; articulate agreement with TextBehind to ensure non-privileged legal material processing; offer commissary-sold per-page photocopies and word processors, identical to other states and such as NCDAC commissaries routinely sell honeybuns, scented oils, and sunglasses, e.g.; establish NCDAC pre-approved vendors providing for-profit legal-related services to prisoners mailed direct to prisoner's facility; staff or prisoner-hosted tutorials providing "Law Library" app and research orientation to unlearned prisoners; establish routine procedure by which prisoners may petition the facility Warden, as needed and on a case-by-case basis, seeking approval to receive non-privileged legal material sent direct to facility; and permit licensed paralegals and university-sponsored legal clinics either privileged or non-privileged access to mail legal material to pro se, indigent prisoners. "If an inmate claimant can point to an alternative that fully accomodates the prisoner's rights at de minimis cost a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Turner, 482 U.S. at 91. "Where a regulation is, or is akin to, a "blanket" prohibition, moreover, courts seem more likely to rule it unconstitutional." Prison Legal News v.

_Northwestern Regional Jail Authority_, 2017 WL 4415659 (W.D.VA, Harrisonburg Division, Sept. 29, 2017)(quoting _Mann v. Smith_, 796 F.2d 79, 81-82 (5th Cir. 1986)).

## C.) Special Draw Denial/Retaliation

"Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." _Jones v. Solomon_, 90 F.4th 198 (4th Cir. 2024). "The filing of a lawsuit carries significant constitutional protections, implicating the First Amendment right to petition the government for redress of grievances, and the right of access to courts." _Am. Civil Liberties Union of Md., Inc., v. Wicomico City, MD_, 999 F.2d 780, 785 (4th Cir. 1993); _Shaw v. Foreman_, 59 F.4th 121 (4th Cir. 2023). Retaliation against an inmate for the exercise of his right to access the courts states a cognizable claim. _Hudspeth v. Figgins_, 584 F.2d 1345, 1347-48 (4th Cir. 1978). Such retaliation by an official is actionable even if the act would have been proper if taken for different reasons. In order to state a retaliation claim, the "plaintiff must allege _either_ that the retaliatory act was taken in response to the exercise of a constitutionally-protected right _or_ that the act itself violated such a right." _Adams v. Rice_, 40 F.3d 72, 75 (4th Cir. 1994)(emphasis added). The plaintiff must allege sufficient facts to warrant concern that the alleged retaliation might have a chilling effect on the exercise of the right to access the courts and show that he suffered more than de minimis inconvenience. _Wicomico_, 999 F.2d at 785-86 & n.6. The inmate need not succumb entirely or even partially to the threat; it is sufficient that the retaliation was intended to limit the inmates right of access to the court "and was reasonably calculated to have that effect." _Hudspeth_, 584 F.2d at 1348; _McFadden v. Lewis_, 517 Fed. App'x 149 (4th Cir. 2013)(emphasis added). For a retaliation claim to survive summary judgment, a plaintiff must produce evidence showing that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected plaintiff's First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." _Martin v. Duffy_, 977 F.3d 294, 299 (4th Cir. 2020). To show causation, plaintiff must

demonstrate that his "protected conduct was a substantial or motivating factor in [the defendant's] decision to take adverse action." Id at 300 (emphasis added). If the plaintiff makes that showing, the burden shifts to the defendant to establish "a permissible basis for taking that action." Id. The defendant must show by a preponderance of the evidence that he "would have reached the same decision ... in the absence of the protected conduct." Id at 299 (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283 (1977))(emphasis added). "If the defendant fails to carry that burden, the inference is that but for causation ... has been shown: the plaintiff would not have been harmed had his rights not been violated by the defendant." Id. at 299; Webb v. Butler, 2023 WL 2597604 (4th Cir. 2023).

There can be no dispute that Plaintiff has satisfied the first prong of the test: filing lawsuits is protected activity, Booker v. S.C. Dep't. of Corr., 855 F.3d 533, 540 (4th Cir. 2017), and Plaintiff's "three pending civil lawsuits against NC DOC" was the protected activity. The Special Draw was an essential conduit to sustain the lawsuits. Defendant Owens admitted to denying the Special Draw, thus the adverse action. While Defendant Owens et al have offered a laundry list of inapplicable and irrelevant reasons for the denial, "the evidence as a whole demonstrates that the proffered permissible reason is not the actual reason but merely a pretext." Savoy v. Bishop, 706 Fed. App'x 786 (4th Cir. 2017) (quoting Hill v. Lockheed Martin Logistics Mgmt, Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc))(emphasis added). See also Martin, 977 F.3d at 305 (finding dispute of material fact where the defendant "failed to identify any specific[s]" regarding her supposed reasons for taking the challenged action) (emphasis added).

## First Amendment Injury Standard / All Claims

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373-74 (1976). In the context of First Amendment violations ... injury to a protected First Amendment interest can itself constitute compensable injury wholly apart from any "emotional distress, humiliation and personal indignity, emotional pain, embarrassment, fear,

anxiety and anguish" suffered by plaintiffs. _Pender v. Pender County Bd. of Educ._, 835 F.2d 1076 (4th Cir 1987); _Ross v. Meese_, 818 F.2d 1132, 1135 (4th Cir 1987); _Haze v. Harrison_, 961 F.3d 654, 658 (4th Cir. 2020); _Rowe v. Shake_, 196 F.3d 778, 781-82 (7th Cir. 1999). See also _Green v. Beck_, 539 Fed. App'x 78 (4th Cir. 2013) (unpublished), holding that a "First Amendment injury occurs whenever a prisoner is compelled to forfeit his free exercise rights, not simply whenever some further harm befalls him" due to his forfeiture.

## Official Capacity/Claim's A & B

In an official capacity lawsuit... the lawsuit is "treated as a suit against the entity", which must then be a "moving force" behind the deprivation," thus, the entity's "policy or custom" must have played a part in the violation of federal law." _King v. Rubenstein_, 825 F.3d 206 (4th Cir. 2016)(quoting _Monell v. Dep't of Soc. Servs. of City of New York_, 436 U.S.658, 694, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978)). Because Defendant Lassiter and Ishee's policies had "some connection with the enforcement of the [challenged] act," _Ex Parte Young_, 209 U.S. 123 (1908), Plaintiff's official capacity claims against those Defendant's should proceed to trial.

## Qualified Immunity/All Claims

In determining whether a right at issue was clearly established for purposes of qualified immunity, courts "must consider not only specifically adjudicated rights, but also those manifestly included within more general applications of the core constitutional principles invoked." _Booker v. S.C. Dep't. of Corr._, 855 F.3d 533, 538 (4th Cir. 2017). "In other words, defendants 'can still be on notice that their conduct violates established law even in novel factual circumstances', so long as the law provided 'fair warning' that their conduct was unconstitutional". Id.(quoting _Hope v. Pelzer_, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed 2d 666 (2002)); _Bobbitt v. Scott_, 2019 WL 1978475 (W.DNC, Charlotte Division, May 3, 2019). "In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite the factual differences

between the two." Jones v. Solomon, 90 F. 4th 198 (4th Cir. 2024) (quoting Williams v. Strickland, 917 F. 3d 763, 770 (4th Cir. 2019)). As the Supreme Court explained, Section 1983 anticipates that a government official will be "responsible for the natural consequences of his actions." Malley v. Briggs, 475 U.S. 335, 344, n.7, 106 S. Ct. 1092, 89 L.Ed. 2d 271 (1986). "It is not unfair to hold liable the official who knows or should know he is acting outside the law." Crawford-El v. Britton, 523 U.S. 574 (1998) (quoting Butz v. Economou, 438 U.S. 478, 500-504 (1978)) (emphasis added). "Summary judgment on quality immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." Vathekan v. Prince George's Cnty., 154 F.3d 173, 180 (4th Cir. 1998).

## CONCLUSION

As shown above, viewed in the light most favorable to Plaintiff, Defendants' violated Plaintiff's First Amendment rights to Free Speech and to receive mail, and be free of retaliation for filing lawsuits against NCDAC and its agents, and these rights were clearly established. The deprivations occured due to Defendants' deployment of unconstitutional, content-based patterns, practices, policies, and customs, and pursuant to the talismanic invocation of "security", and regarding Defendant Owens, with malicious motivations.

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied in full.

I, Cobey LaKemper, hereby swear under penalty of perjury that all statements contained herein are true and correct to the best of my knowledge and belief on this date.

Date: 25 March 2024

Cobey LaKemper

633 Old Landfill Road

Taylorsville, NC 28681