IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CT-3083-FL

COBEY LAKEMPER,                    )
                                   )
                    Plaintiff,     )
                                   )
        v.                         )                    ORDER
                                   )
TODD E. ISHEE, KENNETH E.          )
LASSITER, and BARNEY OWENS,        )
                                   )
                    Defendants.[1] )


        This matter is before the court on defendants' motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56 (DE 71).   The motion was briefed fully and in this posture the

issues raised are ripe for ruling.

## STATEMENT OF THE CASE

        Plaintiff, a state inmate proceeding pro se, commenced this action by filing complaint on

February 25, 2020, asserting claims for violations of his civil rights pursuant to 42 U.S.C. § 1983.

Pursuant to the operative amended complaint filed August 25, 2021, plaintiff challenges the North

Carolina Department of Adult Correction's ("DAC") policies prohibiting inmates from providing

legal assistance to other inmates, and from receiving legal mail from outside sources who are not

attorneys, on First Amendment grounds.   He further asserts defendant Barney Owens ("Owens")

retaliated against him for exercise of his First Amendment rights.   Defendants, sued in their

---

[1]        The court constructively amends the case caption to reflect dismissal of formerly named defendants Brad
Perritt and Erik A. Hooks, on July 18, 2022, and September 17, 2024, respectively.

individual and official capacities, are Todd E. Ishee ("Ishee"), the DAC commissioner of prisons during the relevant time period, Kenneth E. Lassiter ("Lassiter"), the former DAC director of prisons, and Owens, warden of the Pamlico Correctional Institution ("PCI"). As relief, plaintiff seeks compensatory and punitive damages, and various forms of injunctive and declaratory relief.

Following a period of discovery, and in accordance with the court's case management order, defendants now move for summary judgment. Defendants argue that the undisputed evidence shows the inmate legal assistance policy is reasonably related to legitimate penological purposes, and thus plaintiff's claim challenging this policy fails as a matter of law. As to the legal mail policy, defendants argue that plaintiff cannot establish as a factual matter that sending legal materials is prohibited under the policy. Finally, defendants assert plaintiff cannot establish the adverse action or causation elements of the retaliation claim.

In support of the motion, defendants rely upon memorandum of law, statement of material facts, and appendix of exhibits thereto comprising the following: 1) declaration of counsel; 2) plaintiff's DAC records; 3) press article addressing changes to mail policies in New Jersey prisons; 4) DAC policies and procedures; 5) website showing third-party mail service provider TextBehind's terminology for categorizing inmate mail; 6) plaintiff's "special draw" requests and DAC officials' responses; 7) plaintiff's administrative grievance records; 8) plaintiff's electronic correspondence with a legal vendor; and 9) personal declarations of defendants and formerly named defendant Erik Hooks ("Hooks"), the former secretary of DAC.

Plaintiff responded in opposition to the motion, relying on memorandum of law, responsive statement of facts, and appendix of exhibits comprising the following: 1) plaintiff's personal declaration; 2) declarations or affidavits of third parties Anthony Arnold ("Arnold"), Roger

Edwards ("Edwards"), Joseph Lee Ingle, II ("Ingle"), Daniel S. Lucas ("Lucas"), Earnest Richardson ("Richardson"), Raymond Rivers ("Rivers"), Michael C. Sauls ("Sauls"), Marty Thompson ("M. Thompson"), Zachary Thompson ("Z. Thompson"), John W. Wall ("Wall"), Franklin Willis ("Willis"), Chance Wilson ("Wilson"), and Edwardo Wong ("Wong"), all of whom were inmates in custody of the DAC during the relevant time; 3) declaration of Timothy Sookram ("Sookram"), an attorney with North Carolina Prisoner Legal Services, Inc. ("NCPLS"); 4) plaintiff's discovery requests; 5) correspondence between plaintiff and Sookram; 6) DAC policies and procedures; 7) plaintiff's administrative grievance records; 8) correspondence between plaintiff and NCPLS; 9) NCPLS informational brochure; 10) correspondence between plaintiff and Michele R. Luecking-Sunman, an NCPLS attorney; 11) correspondence between plaintiff and Lindsay Bass, an NCPLS attorney; 12) plaintiff's March 4, 2024, trust fund account statement; 13) TextBehind's mail policy; 14) correspondence between plaintiff and Elite Paralegal & Prisoner Services, LLC ("EPS"); 15) envelope for mail from the American Prison Writing Archive; 16) settlement agreement and release between plaintiff and DAC officials; 17) notices of mail rejections; 18) correspondence between plaintiff and defendant Owens; 19) plaintiff's request for special draw from his inmate trust account; 20) EPS informational brochure; 21) correspondence between plaintiff and T. Freeman, a DAC official responsible for inmate trust fund services; 22) plaintiff's offender request forms regarding requests for copies of legal documents; and 23) defendants' responses to plaintiff's discovery requests.   Defendants replied in further support of the motion.

## STATEMENT OF FACTS

Except as otherwise noted below, the court recounts the facts in the light most favorable to

3

plaintiff.   Following his state criminal conviction, plaintiff was sentenced to life imprisonment in the DAC.   (Defs' Ex. A (DE 74-1) at 6).   As noted above, plaintiff alleges three claims in this action:   1) First Amendment challenge to DAC's prohibition on inmate legal assistance; 2) First Amendment challenge to the legal mail policy; and 3) retaliation against defendant Owens.   The factual background relevant to each claim is set forth below.

A.      Inmate Legal Assistance Policy

DAC policy provides that inmates "are not permitted to assist each other with litigation or legal matters except for assigned law library clerks.   Assigned law library clerks are not trained in the law and only provide assistance to those offenders who are unable to read and/or write." (Defs' Ex. G (DE 74-1) at 59).[2]   According to defendants, this policy is necessary to prevent extortion, bartering, and gang activity among inmates.   (Lassiter Decl. (DE 74-3) ¶ 4).   More specifically, allowing inmates to provide legal assistance to one another "presents a unique situation wherein inmates could potentially pass improper information to other inmates, such as gang information, instructions on how to manufacture contraband, or security-sensitive information." (Id.).   Defendants also note that it is unlawful in North Carolina for non-lawyers to provide legal advice.   (Id.).   Thus, DAC officials determined that the policy "deterred illegal conduct, assisted in suppressing contraband and gang activity, and maintain[ed] discipline and control." (Id.).

Plaintiff emphasizes that this policy effectively prohibits all speech that is legal in nature between inmates, as opposed to only legal assistance.   (Pl's Decl. (DE 81-1) at 2; Sauls Decl. (DE

---

[2]      Throughout this order, page numbers in citations to documents in the record are to the page number specified in the footer of the document supplied by the court's case management / electronic case filing (CM/ECF) system for the docket entry (DE) and not the page number, if any, showing on the face of the underlying document.

81-1) at 19; M. Thompson Decl. (DE 81-1) at 23; Wall Aff. (DE 81-1) at 26; Edwards Decl. (DE 81-1) at 11). In addition, defendants have not identified specific instances of bartering, extortion, gang activity, or passing contraband occurring when inmates violate the policy and provide legal assistance to each other. (Defs' Disc. Resps. (DE 81-36) at 8–9). Notably, plaintiff is indigent and cannot afford to hire an attorney for legal advice or assistance in litigation. (Pl's Decl. (DE 81-1) at 4).

B.     Mail Policy

In 2021, DAC contracted with TextBehind, a third-party communications company, to process most personal inmate mail. (Ishee Decl. (DE 74-4) ¶ 6). Generally, TextBehind processes inmate mail by scanning copies of the mail and delivering it electronically to the inmate's facility. (Id.). Facility staff then review the mail and if it is approved distribute the mail to inmates. (Id.; see also Defs' Ex. D. (DE 74-1) at 18–19). DAC changed its mail policy to prevent the introduction of contraband through regular mail sent to inmates. (Ishee Decl. (DE 74-4) ¶ 6).

TextBehind does not process "legal mail," which is instead sent to the institution for hand delivery to the inmate. (Id.). Legal mail is defined as "mail to and from attorneys, paralegals working at the direction of attorneys, state and federal courts, the Attorney General of the United States or the Attorney General of North Carolina, the judiciary, the [North Carolina] Industrial Commission, consular officials, or legal aid services." (Defs' Ex. D (DE 74-1) at 16). This policy definition was promulgated in October 2021. (Pl's Mem. (DE 78) at 11).[3] The policy in effect prior to October 2021 permitted legal mail sent by a "paralegal" without qualification. (Pl's

---

[3]     Plaintiff's memorandum is signed and sworn under penalty of perjury, and thus it is appropriately considered when resolving the instant motion for summary judgment. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Ex. O (DE 81-16) at 2.  Under the current policy, inmates "are prohibited from employing the more affordable services of an independent paralegal (for search [and] copying) and must . . . employ an attorney . . . for incoming legal material sent to the facility to be recognized as privileged and 'legal mail.'"  (Pl's Mem. (DE 78) at 11–12).

TextBehind's policies are also relevant to plaintiff's claims.  TextBehind differentiates between "privileged mail" and "non-privileged mail."  (Defs' Ex. E (DE 74-1) at 32).  Privileged mail refers to "any document sent only by a practicing attorney or a public official."  (Id.).  Mail sent from these officials cannot be accessed or processed by TextBehind, and such mail is returned to sender.  (Id.).  Non-privileged mail, by contrast, is processed by TextBehind and includes with certain exceptions not relevant here, "any communication sent by a family member, friend, inmate, organization, or educator regardless of its content."  (Id.).

Plaintiff asserts this policy is not followed.  Instead, "TextBehind maintains a pattern, practice, and custom of summarily rejecting and returning non-privileged material legal in nature from non-legal [and non-privileged] sources."  (Pl's Resp. SOMF (DE 79) ¶ 22; Pl's Decl. (DE 81-1) at 4; Sauls Decl. (DE 81-1) at 19–20; Lucas Aff. (DE 81-1) at 14).  "As a matter of course, [TextBehind has] rejected personal legal papers, case transcripts, affidavits from family, court opinions, [and] general legal copies [sent from non-privileged sources]."  (Pl's Decl. (DE 81-1) at 4).  And where DAC does not permit inmates' family or friends, or other organizations/vendors who are not affiliated with attorneys, to send these materials to inmates directly, plaintiff in effect is not able to obtain legal materials or copies of legal documents from any third-party, non-attorney

6

sources.  (Id.).

C.    Retaliation Claim

The retaliation claim implicates DAC's policy governing inmates' requests for payments from their trust accounts, known as "special draws."  (Defs' Ex. H (DE 74-1) at 65).  The policy provides that a special draw is a "process that enables offenders to send money from their trust fund account for purposes as defined and approved by [DAC] policy."  (Id.).  For example, inmates may request special draws for purposes such as supporting dependents, paying attorneys or other legitimate creditors, procuring permitted articles, or transmitting funds from one inmate's account to another.  (Id. at 65–66).  Although the policy does not address directly whether inmates can send money to a vendor for future services, it does provide that inmates must show proper documentation for any request, such as a "bill, invoice, or statement."  (Id. at 66).  The policy also provides that if the request is for a purchase that requires a completed order form from the third-party vendor, the order form must accompany the special draw request.  (Id. at 66).  Finally, inmates are prohibited from incurring debt while incarcerated.  (Id.).  "This means that full payment must accompany an order for a magazine, book, etc.  The offender cannot place the order without payment, nor can he make monthly payments."  (Id. at 66–67).

Plaintiff uses Elite Paralegal Services ("EPS") to obtain legal materials and copies of relevant documents for litigation and other legal matters.  (Pl's Decl. (DE 81-1) at 21).  On April 15, 2021, plaintiff submitted a special draw request seeking payment of $900 to EPS to "perform legal research and provide legal materials and copies" for "upcoming needs pertaining to my civil cases."  (Pl's Ex. Z (DE 81-27); Defs' Ex. I (DE 74-1) at 71).  On the form, plaintiff stated, "I have three pending civil lawsuits against [DAC] and need the services of EPS in order to litigate

7

[the claims]." (Pl's Ex. Z (DE 81-27)). That same day, plaintiff's unit manager, officer Riggs, requested further information about EPS's services, which plaintiff provided. (Pl's Decl. (DE 81-1) at 6–7). The unit manager approved the request and forwarded it to defendant Owens, the PCI warden, for supervisory approval. (See id.; Pl's Ex. Z (DE 81-27)). Defendant Owens, however, denied the request without providing explanation. (Pl's Ex. Z (DE 81-27)).

After the request was denied, Riggs told plaintiff that he had never known defendant Owens to deny a special draw request. (Pl's Decl. (DE 81-1) at 7). Defendant Owens's administrative assistant also told plaintiff that he would "be stupid to think" that the DAC "trust fund office would release my funds to use in a lawsuit against [DAC]." (Id. at 7). On April 27, 2021, T. Freeman, a DAC official, sent plaintiff a letter stating that DAC policy does not permit inmates to send money "to open accounts for future use." (Defs' Ex. I (DE 74-1) at 73). On May 7, 2021, defendant Owens responded to plaintiff's inquiry regarding the denial, stating that the special draw request did not comply with policy that inmates cannot incur debt and that "full payment must accompany an order [for the request to be approved]." (Pl's Ex. DD (DE 81-31)). As a result, plaintiff could not obtain legal copies, civil litigation research material, or other legal aid from EPS or others. (Pl's Decl. (DE 81-1) at 7–8).

Plaintiff filed administrative grievance challenging the denial of this special draw request. (Defs' Ex. L (DE 74-1) at 162–170). Responding officials provided several reasons for denying the special draw request. (Id.). At the step-one, unit response, a DAC official explained that the policy requires that special draw requests be accompanied by "acceptable documentation" such as a bill or invoice, and sufficient "written justification" for the request. (Id. at 169). In addition, the official stated "full payment must accompany an order for a magazine, book, etc. [Inmates

8

cannot] place any order without payment, nor can offenders make monthly payments." (Id.). Finally, the official noted the policy prohibited inmates from incurring debts while incarcerated. (Id.). During the step-one investigation, defendant Owens sent Riggs a memorandum that explained the request was denied for essentially these reasons. (Id. at 168).

Plaintiff appealed to step two of the administrative grievance procedure. (Id. at 169). Before responding to the step-two appeal, Jakee Wooten, a DAC programs director at PCI, sent an email to Freeman, the PCI official responsible for trust fund management, seeking information about why the special draw request was denied. (Id. at 165–66). Wooten noted that plaintiff was attempting to send payment to a paralegal service, and the policy expressly permits payment to attorneys. (Id. at 165). Wooten stated, "I'm still trying to understand why it was denied. He was requesting to make a payment to a paralegal, would that not fall under the attorney category or does it actually have to be an attorney? I need clarity to explain exactly why the money order [request] was denied." (Id. at 165).

Freeman responded with a lengthy email to Wooten dated May 21, 2021. (Id. at 164). Therein, Freeman stated that facility staff investigated EPS "several months ago" and determined that it is not a legal office, but instead an "establishment that provides services." (Id.). During the investigation, DAC officials discovered that EPS provides internet information searches, purchases books for inmates from Amazon or other vendors, copies and enhances photographs, and provides photographs of celebrities, in addition to standard legal research and legal copying services. (Id.). Thus, plaintiff's request was denied in part because he did not provide proper documentation for the request, such as a bill or invoice, or an order form to the extent he was

9

attempting to purchase specific books, magazines, or legal services. (Id.).

Wooten then drafted the step-two response denying the appeal. (Id. at 163). Wooten explained the special draw request was denied because "[u]pon research of [EPS], it was discovered they are not a legal office, but an establishment that provides services. Offenders are only authorized to send money to licensed attorneys/legal agents." (Id.).

Finally, plaintiff appealed to step three. (Id.). At that level, the inmate grievance examiner explained that "my review of these responses reveals that prison staff have taken appropriate action to address and resolve the offender's concerns." (Id. at 162). But the examiner also noted that "wardens may not be approving special draws for monies going directly to individuals" due to concerns about contraband smuggling. (Id.). This portion of the response does not appear to be relevant to plaintiff's grievance.

## DISCUSSION

A.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).[4]

---

[4]      Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

11

B.    Analysis

1.    Legal Assistance Policy

The court begins with plaintiff's First Amendment challenge to DAC's policy prohibiting inmates from providing legal assistance to one another.    Inmates retain certain First Amendment protections, including limited rights to freedom of speech.    See Shaw v. Murphy, 532 U.S. 223, 228–29 (2001); Turner v. Safley, 482 U.S. 78, 89–90 (1987).    As explained in the court's prior orders, plaintiff's challenge to this policy is based on his First Amendment right to speak with others about legal matters.    (See, e.g., July 18, 2022, order (DE 25) at 3–7).    To the extent plaintiff attempts to challenge the policy based on his right of access to the courts, that claim was dismissed in earlier proceedings.    (Id.).

"[W]hen a prisoner claims that a prison practice or regulation is invalid because it impinges on his constitutional rights, he prevails only if he shows the prison's policy is not 'reasonably related to legitimate penological interests.'"    Lumumba v. Kiser, __ F.4th __, 2024 WL 4097525, at *4 (4th Cir. Sept. 6, 2024) (quoting Turner, 482 U.S. at 89).[5]  The court considers four factors when determining whether a policy satisfies Turner's reasonable relationship test:

> (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there was an "absence of ready alternatives" to the regulation in question.

---

[5]    To the extent plaintiff suggests that a heightened standard applies to his legal speech because the regulation is content based, that argument is without merit.  The Supreme Court has "decline[d] to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech. Instead, the proper constitutional test is the one [the Court] set forth in Turner.  Irrespective of whether the correspondence contains legal advice, the constitutional analysis is the same."  Shaw, 532 U.S. at 231–32.

12

Heyer v. United States Bureau of Prisons, 984 F.3d 347, 356 (4th Cir. 2021) ("Heyer II") (quoting Turner, 482 U.S. at 89–90)).  The court must afford "substantial deference to prison officials' judgment, particularly with respect to the third factor."  Lumumba, 2024 WL 4097525, at *4.  "The burden is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."  Jehovah v. Clarke, 798 F.3d 169, 176 (4th Cir. 2016).

Here, defendants explain that the policy was enacted to prevent inmates from engaging in extortion, bartering, or gang activities.  (Lassiter Decl. (DE 74-3) ¶ 4).  Defendant Lassiter further notes that inmate legal assistance "presents a unique situation wherein inmates could potentially pass improper information to other inmates, such as gang information, instructions on how to manufacture contraband, or security-sensitive information."  (Id.).  The policy also prevents inmates from engaging in the unauthorized practice of law, which is illegal in North Carolina.  (Id.).  Thus, defendants argue the policy is necessary to deter illegal conduct, assist in suppressing contraband and gang activity, and to maintain inmate discipline and control.  (Id.).

This policy satisfies Turner's reasonable relationship test.  There is a valid connection between prohibiting inmate legal assistance and the proffered justifications, where inmate "law clerks" could charge other inmates for providing legal services, including by requesting contraband or that the receiving inmate engage in other prohibited activity.  (See id.).  Inmates providing legal assistance also can conceal hidden messages regarding gang activity or contraband in confidential legal documents.  (See id.).  As a result, the policy is rationally connected to DAC's goals of maintaining good order and discipline, and of preventing the unauthorized practice of law, and other crimes, in its facilities.  (See id.); see Heyer v. United States Bureau of Prisons, 849 F.3d 202, 215 (4th Cir. 2017) ("Heyer I") ("There is no doubt that [the Federal Bureau of Prisons]

13

has a legitimate interest in maintaining the security of its facilities and in protecting the public from further criminal acts by inmates and detainees."); Heyer II, 984 F.3d at 357 ("A logical connection, even in the most general sense, will suffice.").

Plaintiff argues that defendants have not offered evidence showing that inmates engaged in impermissible conduct when providing legal assistance to others. But such evidence is not required for the policy to satisfy Turner. See Lumumba, 2024 WL 4097525, at *5 (analyzing Turner's first factor based on whether the policy hypothetically could prevent future misconduct by prisoners); Firewalker-Fields v. Lee, 58 F.4th 104, 116 (4th Cir. 2023) (relying on "inherent dangers in letting prisoners form affinity groups" under first factor).

Plaintiff also suggests that global ban on prisoner legal assistance, which is enforced in a manner that prohibits inmates from speaking about any legal matters, is overly broad. First, plaintiff does provide evidence suggesting inmates are prohibited from discussing legal matters in a broad sense, such as general discussions about widely available news stories covering legal proceedings. (Pl's Decl. (DE 81-1) at 2; see also Sauls Decl. (DE 81-1) at 19–20; M. Thompson Decl. (DE 81-1) at 23; Edwards Decl. (DE 81-1) at 11; Wall Aff. (DE 81-1) at 26–27; Wong Aff. (DE 81-1) at 31; Richardson Aff. (DE 81-1) at 15–16). And to the extent unidentified correctional officers prohibit inmates from speaking about a news story or other widely known legal event, plaintiff does not offer any evidence showing that defendants personally were responsible for such applications of the policy. Indeed, the policy on its face does not cover this conduct. (Defs' Ex. G (DE 74-1) at 59 (prohibiting "assistance with litigation or legal matters")); see also Lumumba, 2024 WL 4097525, at *5 (construing prison regulation based on its plain text and reading it such

14

that "it does not . . . prohibit any conceivable expression of sentiment or feeling directed at anyone in the world").

Second, the fact that the policy broadly prohibits inmates from discussing their personal legal matters with other inmates, or discussing legal concepts or strategy generally, does not in itself show the policy is not rationally related to legitimate penological purposes. It is true the policy covers a broad range of speech that may be constitutional outside of the prison environment. And it applies equally to both inmates who wish to discuss their legal matters solely for purposes of assistance with legitimate legal claims and to those with nefarious goals. But so long as defendants establish rational connection between the policy and the stated goals, and they have done so for the reasons explained above, these facts do not render the policy unreasonable under Turner. Heyer II, 984 F.3d at 357 ("A logical connection, even in the most general sense, will suffice."); Lumumba, 2024 WL 4097525, at *5 (concluding first Turner factor is satisfied even though restricting "participation in or encouragement of . . . demonstrations" covers legal conduct outside the prison system).

Turning to the second factor, the court must determine whether plaintiff has alternative means of exercising his right to give or receive advice about legal matters. Heyer II, 984 F.3d at 356. Although plaintiff suggests that the second factor should address the broader question of whether he has alternative access to legal materials, that argument misunderstands the operative First Amendment claim in this case. In earlier proceedings, the court dismissed plaintiff's claim for violations of his right to access the courts where plaintiff failed to plead the actual injury component of the claim. (July 18, 2022, order (DE 25) at 3–7; see also Lewis v. Casey, 518 U.S. 343, 351 (1996) (explaining inmates do not have an "abstract, freestanding right to a law library

15

or legal assistance"); Christopher v. Harbury, 536 U.S. 403, 414–16 (2002) (addressing actual injury requirement for access to courts claim). Thus, even assuming plaintiff does not have adequate access to legal research materials or other forms of legal assistance, that is not relevant to plaintiff's surviving claim.

As set forth above, the claim challenging the legal assistance policy is based on plaintiff's First Amendment right to freedom of speech, and in particular his right to give or receive advice about legal matters. See Shaw, 532 U.S. at 228 (framing the right as a "First Amendment right to provide legal advice"). As to whether alternative means are available to exercise this right, plaintiff argues that there are no attorneys or legal organizations willing to discuss legal matters with him, in light of his indigency, and defendants' legal assistance policy prohibits him from discussing these issues with other inmates. Plaintiff, however, is free to discuss legal matters with family, friends, and other third parties outside the prison. The policy only prohibits legal assistance by other inmates. (Defs' Ex. G (DE 74-1) at 59). As a result, alternative means of exercising this right remain available to plaintiff. See Heyer II, 984 F.3d at 356. The fact that plaintiff cannot obtain legal assistance from trained attorneys or conduct legal research on his own is not relevant to whether plaintiff can speak with others about legal matters. See Lewis, 518 U.S. at 351. Accordingly, this factor also favors defendants.

Proceeding to the remaining factors, the court considers the "impact accommodation of the asserted [right to provide or receive legal advice] will have on guards and other inmates, and on the allocation of prison resources generally" and whether there is an "absence of ready alternatives" to the regulation. Heyer II, 984 F.3d at 356. Defendants assert that permitting inmates to discuss legal matters increases the risk for clandestine gang activity, contraband

16

smuggling, extortion, and impermissible bartering, all which have a negative impact on guards and other inmates and affects the allocation of resources. (See Lassiter Decl. (DE 74-3) ¶ 4). As noted, the court owes substantial deference to officials' judgment on this third factor. Lumumba, 2024 WL 4097525, at *4.

With respect to the fourth factor, plaintiff suggests correctional officers can be trained to distinguish between legal advice that is provided in good faith and without crossing the line to unauthorized practice of law, and legal advice given for impermissible reasons. (Pl's Mem. (DE 78) at 26). But this alternative would require additional correctional officer training and that officers conduct even more careful supervision of inmate speech than is necessary under the current policy. Such a change would cause a "drain on scarce resources" and it therefore does present a "ready alternative" to the current system. Lumumba, 2024 WL 4097525, at *4; Firewalker-Fields, 58 F.4th at 118. Accordingly, these factors also favor defendants.

In sum, the prohibition on inmate legal assistance is reasonably related to legitimate penological interests, and plaintiff's First Amendment challenge to the policy therefore fails. See Shaw, 532 U.S. at 231. Accordingly, defendants' motion for summary judgment is granted as to this claim.

2.    Legal Mail Policy

Plaintiff argues that defendants refuse to provide him access to legal materials through standard prisoner mail because TextBehind, the vendor responsible for inmates' personal mail, will not accept legal materials such as copies of case law, transcripts of proceedings, affidavits or declarations, or similar materials. Defendants' mail policies, however, do not prohibit TextBehind from processing these materials, and thus to the extent plaintiff cannot obtain them

through TextBehind, defendants are not responsible for this alleged interference with plaintiff's mail.

As set forth above, defendants' mail policy provides that most inmate mail is sent first to TextBehind for scanning, and TextBehind then transmits electronic copies of the mail to the correctional facility. (Defs' Ex. D. (DE 74-1) at 18–19; Ishee Decl. (DE 74-4) ¶ 6). Pursuant to the policy, TextBehind "will not accept legal mail." (Defs' Ex. D. (DE 74-1) at 19). The term legal mail, in turn, is defined as "mail to and from attorneys, paralegals working at the direction of attorneys, state and federal courts, the Attorney General of the United States or the Attorney General of North Carolina, the judiciary, the [North Carolina] Industrial Commission, consular officials, or legal aid services." (Id. at 16). Relatedly, TextBehind's policy provides that it will not process "privileged mail," which is "any document sent only by a practicing attorney or a public official." (Defs' Ex. E (DE 74-1) at 32). TextBehind processes most other mail, including "any communication sent by a family member, friend, inmate, organization, or educator regardless of its content." (Id.).

Here, plaintiff does not offer evidence showing that defendants were responsible for any delays or non-receipt of his mail. The policies described above permit third party organizations, including EPS or other organizations run solely by paralegals, to send case law, transcripts of legal proceedings, affidavits/declarations, and all manner of legal material to TextBehind for processing, so long as it does not meet the very specific definition of legal mail. (Defs' Ex. D. (DE 74-1) at 16, 18–19; Ishee Decl. (DE 74-4) ¶ 6; Defs' Ex. E (DE 74-1) at 32). If the mail is from an attorney or other relevant public official, or otherwise qualifies as legal mail, then it can be sent directly to plaintiff's correctional facility for processing as standard legal mail. (Defs' Ex. D. (DE 74-1) at

18

16, 18–19).   The fact that TextBehind may have violated its own and DAC's policies by rejecting non-privileged or non-legal mail does not mean that defendants personally interfered with plaintiff's mail.   Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must [show] that each Government-official defendant, through the official's own individual actions, has violated the Constitution").   Accordingly, defendants are entitled to judgment as a matter of law as to this claim.

      3.     Retaliation

Finally, plaintiff asserts defendant Owens retaliated against him for filing lawsuits against DAC officials by denying his "special draw" request to send money to EPS for legal research and copying services.   A retaliation claim requires proof of the following: 1) that the plaintiff engaged in constitutionally protected First Amendment activity; 2) the defendant took an action that adversely affected that activity; and 3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct.   Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017); see also Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).   "[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Martin, 858 F.3d at 249; Constantine, 411 F.3d at 500.   This is an objective standard, and thus the plaintiff's individual reaction to the defendant's conduct is not dispositive of the second element. See Constantine, 411 F.3d at 500 ("We reject the defendants' suggestion that this inquiry depends upon the actual effect of the retaliatory conduct on a particular plaintiff.").   Finally, "a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than de minimis inconvenience to her exercise of First Amendment rights."   Id.

19

As discussed above, plaintiff requested that PCI officials send $900 from his trust account to EPS for "legal research and . . . legal materials and copies" for "upcoming needs" pertaining to his "three pending civil lawsuits against [DAC]." (Pl's Ex. Z (DE 81-27); Defs' Ex. I (DE 74-1) at 71). Defendant Owens explained that he denied the request because it did not comply with the special draw policy, including that inmates cannot incur a debt and that "full payment must accompany an order." (Pl's Ex. DD (DE 81-31)).

Even assuming plaintiff engaged in protected First Amendment activity by filing the lawsuits noted in the request, no reasonable jury could find for him on the second and third elements. As to the second element, one denial of a special draw request would not deter a person of ordinary firmness from filing lawsuits. Martin, 858 F.3d at 249. No disciplinary action was taken against plaintiff. He was not demoted to a more restrictive custody status, placed in administrative segregation, or transferred to a less desirable prison. Compare Jones v. Solomon, 90 F.4th 198, 214–16 (4th Cir. 2024) (transfer to less favorable prison may establish adverse action); Martin v. Duffy, 977 F.3d 294, 305 (2020) (same for placement in administrative segregation).

Plaintiff argues that he could not obtain necessary legal materials once the special draw request was denied, thereby preventing him from litigating his pending lawsuits, and that this satisfies the adverse action component. But plaintiff did not even attempt to resubmit the request with an order form or other documentation showing a specific order and payment for same. (Pl's Ex. DD (DE 81-31) (defendant Owens suggesting the request would have been approved in these circumstances)). In the absence of evidence showing that defendant Owens would have denied a request that complied with policy, no reasonable juror could find that a person of ordinary firmness

20

would be deterred from filing lawsuits based on this one denial of a special draw request. See Martin, 858 F.3d at 249.

For essentially the same reasons, plaintiff has not shown that the retaliation resulted in anything more than de minimis inconvenience to his First Amendment rights. Constantine, 411 F.3d at 500. Defendant Owens denied the request the same day it was submitted, and explained the basis for the denial approximately three weeks later. (Pl's Ex. Z (DE 81-27) (showing defendant Owens denied the request the day it was received); Pl's Mem. (DE 78) at 7; Pl's Ex. DD (DE 81-27)). Plaintiff does not show that this delay caused prejudice to pending cases within that three-week period of time, such as inability to file or respond to substantive motion on time. (See Mot. to Amend (DE 22) at 2 (stating that plaintiff's state tort claim was dismissed on November 4, 2021, approximately six months after defendant Owens denied the request); Pl's Mem. (DE 78) at 22 (citing to dismissal of this tort claim as evidence of injury)). And any delay beyond that is not attributable to defendant Owens, where plaintiff could have resubmitted the request with the proper documentation. Thus, because plaintiff could have obtained the services if he complied with defendant Owens's interpretation of the policy, by simply submitting the correct documentation showing the charges, he suffered only de minimis inconvenience. See Constantine, 411 F.3d at 500.

Turning to causation, plaintiff must show that his "protected conduct was a substantial or motivating factor in [the defendant's] decision to take adverse action." Martin, 977 F.3d at 299. And even if the plaintiff makes that showing, the burden shifts to the defendant to establish "a permissible basis for taking that action." Id. at 300. The defendant must show by a preponderance of the evidence that he "would have reached the same decision . . . in the absence

21

of the protected conduct." Id. at 299; see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283 (1977).

Here, the court will assume without deciding that plaintiff met his burden of showing the lawsuits were a substantial and motivating factor in defendant Owens' decision to take adverse action. Defendant Owens denied plaintiff's request for special draw on the same day that he arguably learned about plaintiff's lawsuits against DAC, and "temporal proximity alone can create the inference of causation" in this context. See Hodges v. Meletis, 109 F.4th 252, 262 (4th Cir. 2024); (Pl's Ex. Z (DE 81-27) (showing defendant Owens denied the request the day it was received, and that the form referred to plaintiff's lawsuits against DAC)).

But "timing alone generally cannot defeat summary judgment once [the defendant] has offered a convincing, nonretaliatory explanation." S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty., 819 F.3d 69, 79 (4th Cir. 2016).[6] Here, defendant offers uncontradicted evidence that he would have made the same decision even absent the knowledge of the lawsuit.

As set forth above, PCI officials investigated EPS before plaintiff submitted his special draw request and determined that pursuant to DAC policy inmates requesting payment to them must provide a bill, statement, or order form for specific services. (Defs' Ex. L (DE 74-1) at 164). Defendant Owens therefore had no choice but to deny the request in the absence of the correct supporting documentation. (See id.; Owens Decl. (DE 74-5) ¶ 6). Because defendant Owens was acting pursuant to a pre-determined application of the special draw policy, and in the absence

---

[6]    In S.B., the plaintiff asserted an employment-related retaliation claim under the Rehabilitation Act, and the United States Court of Appeals for the Fourth Circuit employed the "burden-shifting framework of McConnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)" to resolve the claim. 819 F.3d at 78. The Fourth Circuit "routinely use[s] Title VII precedents [employing McDonnell Douglas] in the First-Amendment retaliation context." Hodges, 109 F.4th at 262 n.16

22

of any other evidence of adverse action, no reasonable jury could find for plaintiff on the causation element.  See S.B., 819 F.3d at 79.

Under the particular facts and circumstances of this case, the court does not understand Martin v. Duffy, 977 F.3d 294 (4th Cir. 2020), to compel a different conclusion.  In Martin, the plaintiff ("Martin") alleged the defendant's ("Duffy") decision to place him in administrative segregation shortly after he filed an administrative grievance was retaliatory.  977 F.3d at 297–98.  In reversing the district court's grant of summary judgment, the court of appeals broadly stated that "[w]hether Duffy would have placed Martin in segregation absent a retaliatory motive is a question of material fact."  Id. at 305.  But that statement was made in the context of an evidentiary record showing that Duffy placed Martin in administrative segregation shortly after he filed an administrative grievance, "questioned him relentlessly about the grievance," kept Martin in administrative segregation for months, and where Martin "presented circumstantial evidence that this segregation was arbitrary."  Id.

Here, plaintiff offers only the temporal proximity factor as evidence of retaliation.  And the temporal proximity factor itself is undermined by the fact that defendant Owens was acting pursuant to a predetermined policy as noted above.  In addition, defendant Owens did not take any form of disciplinary action against plaintiff, otherwise withdraw privileges, or demote him to a higher custody status.  Compare id.  Nor is there evidence that defendant Owens was aware of the nature of plaintiff's lawsuits against DAC.  The form stated only that plaintiff had "three pending civil lawsuits against [DAC]" which is hardly an uncommon occurrence in North Carolina prisons.  (Pl's Ex. Z (DE 81-27)).  And plaintiff offers no evidence that defendant Owens was

otherwise aware he was personally named as a defendant in any of the lawsuits.[7]   This evidence is far afield from the evidence creating a genuine dispute of fact in <u>Martin</u>.   <u>See</u> 977 F.3d at 305.

Turning to plaintiff's remaining arguments, he notes that defendant Owens approved other inmates' requests for special draws for items unrelated to pending litigation.   (Pl's Decl. (DE 81-1) at 7).   Plaintiff, however, does not show that these requests should have been disallowed under the special draw policy, and defendant Owens is required to approve requests that comply with the policy.   (Defs' Ex. H (DE 74-1) at 65; Owens Decl. (DE 74-5) ¶ 6).   As a result, this evidence is not relevant to the second or third elements of plaintiff's claim.   <u>See</u> <u>Martin</u>, 858 F.3d at 249.

Finally, plaintiff attests that defendant Owens' administrative assistant told him that he "would be stupid to think" the DAC trust fund office would approve funds for lawsuits against DAC.   (Pl's Decl. (DE 81-1) at 7).   However, such evidence is not probative of retaliatory intent on the part of defendant Owens.   Instead, the administrative assistant suggested the trust fund officer made the decision to deny the request with retaliatory intent.   (<u>See</u> <u>id.</u>).   Accordingly, defendant Owens is entitled to judgment as a matter of law on the retaliation claim because plaintiff has not established a triable issue of fact on either the adverse action or causation elements of his claim.

4.     Official Capacity Claims

Defendants also are entitled to summary judgment on plaintiff's official capacity claims. Official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent."   <u>Kentucky v. Graham</u>, 473 U.S. 159, 165–66 (1985).   And

---

[7]     Plaintiff named defendant Owens as a defendant in this action months after the alleged retaliation.   (<u>See</u> Am. Compl. (DE 20) (asserting claims against defendant Owens for the first time on August 25, 2021)).

24

neither States, state officials acting in their official capacities, nor state agencies are "persons" subject to suit under § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Moreover, these claims are barred by the Eleventh Amendment. See Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995).

The exceptions to Eleventh Amendment immunity are not applicable here. See College Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999); Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976); Ex parte Young, 209 U.S. 123, 159 (1908). To the extent plaintiff asserts claims for injunctive relief under Ex Parte Young, plaintiff has not established an ongoing violation of federal law for the reasons explained herein. See Bland v. Roberts, 730 F.3d 368, 390 (4th Cir. 2013).

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 71) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 18th day of September, 2024.

LOUISE W. FLANAGAN
United States District Judge